**Geovanni HERNANDEZ–MONTIEL, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 98–70582.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 8, 1999.

Filed Aug. 24, 2000.

---

Robert S. Gerber, Sheppard, Mullin, Richter & Hampton LLP, San Diego, California, for the petitioner.

Alice E. Loughran, United States Department of Justice, Washington, D.C., for the respondent.

Taylor Flynn, Los Angeles, California, Suzanne Goldberg, New York, New York, Jon W. Davidson, Los Angeles, California, and Shannon Minter, San Francisco, California, for amici curiae American Civil Liberties Union of Southern California, Lamda Legal Defense & Education Fund, Inc., National Center for Lesbian Rights, and International Gay and Lesbian Human Rights Commission.

Before: BRUNETTI and TASHIMA, Circuit Judges, and SCHWARZER,* District Judge.

Opinion by Judge TASHIMA; Concurrence by Judge BRUNETTI.

TASHIMA, Circuit Judge:

Geovanni Hernandez–Montiel ("Geovanni"),[1] a native and citizen of Mexico, seeks review of a decision of the Board of Immigration Appeals ("BIA"), denying his application for both asylum and withholding of deportation. The BIA dismissed Geovanni's appeal because it agreed with the immigration judge ("IJ") that Geovanni failed to show that he was persecuted, or that he had a well-founded fear of future persecution, on account of his membership in a particular social group.

The primary issue we must decide is whether gay men with female sexual identities in Mexico constitute a protected "particular social group" under the asylum statute. We conclude as a matter of law that gay men with female sexual identities in Mexico constitute a "particular social group" and that Geovanni is a member of that group. His female sexual identity is immutable because it is inherent in his identity; in any event, he should not be required to change it. Because the evidence compels the conclusion that Geovanni suffered past persecution and has a well-founded fear of future persecution if he were forced to return to Mexico, we conclude that the record compels a finding that he is entitled to asylum and withholding of deportation.

## I. FACTUAL BACKGROUND

Geovanni testified that, at the age of eight, he "realized that [he] was attracted to people of [his] same sex." At the age of 12, Geovanni began dressing and behaving as a woman.

---

* The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

1. As does petitioner in his own briefs, we refer to Petitioner as "Geovanni," because he was a minor during the relevant events at issue.

He faced numerous reprimands from family and school officials because of his sexual orientation. His mother registered him in a state-run Mexican school and informed the school authorities about what she deemed to be his "problem," referring to his sexual orientation. School authorities directed Geovanni to stop socializing with two gay friends. The father of a schoolmate grabbed Geovanni by the arm and threatened to kill him for "perverting" his son. He was even prevented from attending a school dance because of the way he was dressed. Shortly after the dance, the school asked Geovanni's mother to consent to his expulsion because he was not acting appropriately. He could not enroll in another school because the school refused to transfer his paperwork until he agreed to change his sexual orientation. Geovanni's parents threw him out of their home the day after his expulsion.

Beyond his school and family, Geovanni also suffered harassment and persecution at the hands of Mexican police officers. On numerous occasions, the Mexican police detained and even strip-searched Geovanni because he was walking down the street or socializing with other boys also perceived to be gay. In 1992, the Mexican police twice arrested Geovanni and a friend. The police told them that it was illegal for homosexuals to walk down the street and for men to dress like women. The police, however, never charged Geovanni with any crime.

Police officers sexually assaulted Geovanni on two separate occasions. In November 1992, when Geovanni was 14 years old, a police officer grabbed him as he was walking down the street, threw him into the police car, and drove to an uninhabited area. The officer demanded that Geovanni take off his clothes. Threatening him with imprisonment if he did not comply, the officer forced Geovanni to perform oral sex on him. The officer also threatened to beat and imprison Geovanni if he ever told anyone about the incident.

Approximately two weeks later, when Geovanni was at a bus stop with a gay friend one evening, the same officer pulled up in a car, accompanied by a second officer. The officers forced both boys into their car and drove them to a remote area, where they forced the boys to strip naked and then separated them. One of the officers grabbed Geovanni by the hair and threatened to kill him. Holding a gun to his temple, the officer anally raped Geovanni. Geovanni believes that his friend was also raped, although his friend refused to talk about the incident. Even before the boys could get dressed, the police officers threatened to shoot if they did not start running. The boys were left stranded in an abandoned area.

A few months after the second assault, in February 1993, Geovanni was attacked with a knife by a group of young men who called him names relating to his sexual orientation. He was hospitalized for a week while recovering from the attack.

Geovanni fled to the United States in October 1993, when he was 15 years old. He was arrested within a few days of his October 1993 entry.[2] When Geovanni returned to Mexico to live with his sister, she enrolled him in a counseling program, which ostensibly attempted to "cure" his sexual orientation by altering his female appearance. The program staff cut his hair and nails, and forced him to stop taking female hormones. Geovanni remained in the program from late January to late March 1994. Because his sister saw no changes in him, she brought Geovanni home to live with her. Soon thereafter, however, she forced Geovanni out of her house because he was not "cured" of his gay sexual orientation, despite his

---

**2.** Geovanni testified that while he was walking down the street in San Diego dressed in women's clothing, a man in a car pulled up and offered money in exchange for sex. Geovanni said he would not have sex, but asked the man for a ride. When the car turned the corner, police officers were waiting to arrest him. Geovanni was held in jail in San Diego for a week. There is no documentary evidence concerning the arrest in the record.

change in appearance. He again sought refuge in the United States.

## II. PROCEDURAL BACKGROUND

After a number of attempts to re-enter the United States, Geovanni last entered on or around October 12, 1994, without inspection. He filed an application for asylum and withholding of deportation on February 22, 1995.

At his asylum hearing, Geovanni presented the testimony of Thomas M. Davies, Jr., a professor at San Diego State University and an expert in Latin American history and culture. Professor Davies, who has lived for extended periods of time in Mexico and elsewhere in Latin America, testified that certain homosexuals in Latin America are subjected to greater abuse than others. Professor Davies testified that it is "accepted" that "in most of Latin America a male before he marries may engage in homosexual acts as long as he performs the role of the male." A male, however, who is perceived to assume the stereotypical "female," *i.e.*, passive, role in these sexual relationships is "ostracized from the very beginning and is subject to persecution, gay bashing as we would call it, and certainly police abuse." Professor Davies testified that these gay men with "female" sexual identities in Mexico are "heavily persecuted by the police and other groups within the society.... [They are] a separate social entity within Latin American society and in this case within the nation of Mexico." According to Professor Davies, it is commonplace for police to "hit the gay street ... and not only brutalize but actually rape with batons ... homosexual males that are dressed or acting out the feminine role."

Professor Davies testified that gay men with female sexual identities are likely to become scapegoats for Mexico's present economic and political problems, especially since the recent collapse of the Mexican economy. Professor Davies specifically noted that Geovanni is "a homosexual who has taken on a primarily 'female' sexual role." Based on his expert knowledge, review of Geovanni's case, and interaction with Geovanni, Professor Davies opined that Geovanni would face persecution if he were forced to return to Mexico.

The IJ denied Geovanni asylum on both statutory and discretionary grounds. The IJ determined that Geovanni's testimony was "credible," "sincere," "forthright," "rational," and "coherent." The IJ found, however, that Geovanni had failed to demonstrate persecution "on account of a particular social group," classifying his social group as "homosexual males who wish to dress as a woman [sic.]." The IJ noted that Geovannni "has altered certain outward physical attributes and his manner of dress to resemble a woman." The IJ found Geovanni's female gender identity not to be immutable, explaining:

> If he wears typical female clothing sometimes, and typical male clothing other times, he cannot characterize his assumed female persona as immutable or fundamental to his identity. The record reflects that respondent's decision to dress as a women [sic] is volitional, not immutable, and the fact that he sometimes dresses like a typical man reflects that respondent himself may not view his dress as being so fundamental to his identity that he should not have to change it.

The IJ further found that Geovanni was not entitled to discretionary eligibility and denied voluntary departure in the exercise of discretion.

The BIA dismissed Geovanni's appeal from the IJ's decision. The BIA agreed that Geovanni gave credible testimony, but found that he failed to establish his statutory eligibility for asylum. The BIA found that Geovanni did not meet his burden of "establishing that the abuse he suffered was because of his membership in a particular social group," which the BIA classified as "homosexual males who dress as females." Concluding that the "tenor of the respondent's claim is that he was mistreated because of the way he dressed (as a male prostitute) and not because he is a homosexual," the BIA found that Geovanni

failed to show that "his decision to dress as a female was an immutable characteristic." The BIA did not reach the alternative decision of whether Geovanni established his eligibility for asylum in the exercise of discretion, and it denied Geovanni's request for voluntary departure in the exercise of discretion.

## III. JURISDICTION

The BIA had jurisdiction over this matter pursuant to 8 C.F.R. §§ 3.1(b)(2) & 3.38. We have jurisdiction over the timely petition for review under § 106(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1105a(a), as modified by the transitional rules for judicial review in § 309(c)(4) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996) ("IIRIRA").[3]

■ The Immigration and Naturalization Service ("INS") argues that we do not have jurisdiction because Geovanni allegedly admitted that he was convicted of prostitution in the United States and because he refused to answer questions about his involvement in the juvenile court system. This argument is wholly without merit. Under IIRIRA § 309(c)(4)(G), "there shall be no appeal permitted in the case of an alien who is inadmissible or deportable by reason of having committed a criminal offense covered in section 212(a)(2)...." INA § 212(a)(2)(A)(i)(I) makes an alien ineligible for admission who has been "convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of ... a crime involving moral turpitude...." 8 U.S.C. § 1182(a)(2)(A)(i)(I).

■ Under IIRIRA § 309(c)(4)(G), however, the INS' mere allegation that a crime was committed is insufficient to bar appellate jurisdiction. In the Order to Show Cause ("OSC"), the INS must charge the crimes for which an alien is subject to deportation under IIRIRA § 309(c)(4)(G). *See Briseno v. INS*, 192 F.3d 1320, 1323 (9th Cir.1999) (explaining that this court does "not read 'deportable by reason of having committed' [a crime], IIRIRA § 309(c)(4)(G), as referring to felonies not charged at all in the Order to Show Cause"). The OSC alleged only that Geovanni was subject to deportation because he entered the United States without inspection by an immigration officer, in violation of INA § 241(a)(1)(B). Because the INS did not charge Geovanni with any crime of moral turpitude in the OSC, IIRIRA § 309(c)(4)(G) does not divest this court of jurisdiction.

## IV. DISCUSSION

### A. *Standard of Review*

■ Because the BIA conducted an independent review of the record, our review is limited to the BIA's decision. *See Gonzalez v. INS*, 82 F.3d 903, 907 (9th Cir. 1996); *Yepes–Prado v. U.S. INS*, 10 F.3d 1363, 1367 (9th Cir.1993) (holding that the BIA conducts de novo review when it makes an independent judgment of the record).

We review de novo determinations by the BIA of purely legal questions concerning requirements of the INA. *See Vang v. INS*, 146 F.3d 1114, 1116 (9th Cir.1998). We examine the BIA's factual findings under the substantial evidence standard. *See Marcu v. INS*, 147 F.3d 1078, 1082 (9th Cir.1998) ("Our task is to determine whether there is substantial evidence to support the BIA's finding, not to substitute an analysis of which side in the factual dispute we find more persuasive."), *cert. denied*, 526 U.S. 1087, 119 S.Ct. 1496, 143 L.Ed.2d 650 (1999). Under the substantial evidence standard, "[w]e will uphold the BIA's determination unless the evidence

---

**3.** IIRIRA's transitional rules govern our review because Geovanni's proceedings began on January 2, 1996, and the BIA dismissed his appeal on April 27, 1998. *See Kalaw v. INS*, 133 F.3d 1147, 1150 (9th Cir.1997) (holding that IIRIRA's transitional rules govern in cases in which deportation proceedings began before April 1, 1997, and final orders of deportation entered after October 30, 1996).

compels a contrary conclusion." *Prasad v. INS*, 101 F.3d 614, 616–17 (9th Cir.1996) (citation omitted).

### B. *General Framework*

▉ The Attorney General may, in her discretion, grant asylum to an applicant determined to be a refugee, within the meaning of § 101(a)(42)(A) of the INA, 8 U.S.C. § 1101(a)(42)(A). An alien establishes refugee status if he is unable or unwilling to return to his country of nationality either because: (1) he was persecuted in the past; or (2) he has a well-founded fear of future persecution "on account of race, religion, nationality, membership in a *particular social group*, or political opinion." INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A) (emphasis added); *see also INS v. Cardoza–Fonseca*, 480 U.S. 421, 423, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *Korablina v. INS*, 158 F.3d 1038, 1043 (9th Cir.1998). The Attorney General must withhold deportation of any asylum applicant who establishes a "clear probability of persecution," which is a stricter standard than the "well-founded fear" standard for asylum. *INS v. Stevic*, 467 U.S. 407, 430, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984).

▉ The applicant has the burden of proving his eligibility with "credible, direct, and specific evidence." *Prasad v. I.N.S.*, 47 F.3d 336, 338 (9th Cir.1995) (citation omitted). We have held that where "the IJ expressly finds certain testimony to be credible, and where the BIA makes no contrary finding, we accept as indisputed the testimony given at the hearing before the IJ." *Velarde v. INS*, 140 F.3d 1305, 1309 (9th Cir.1998) (internal quotation marks and citations omitted). Here, the IJ found Geovanni's testimony to be "credible," "sincere," "forthright," "rational," and "coherent." The BIA agreed that "the respondent testified credibly regarding the events that occurred in his life." Thus, we also accept Geovanni's testimony.

### C. *Membership in a "Particular Social Group"*

▉ This case turns on the legal question of whether Geovanni was persecuted on account of his membership in a "particular social group." *See Fatin v. INS*, 12 F.3d 1233, 1239–42 (3d Cir.1993) (reviewing de novo legal question of what constitutes a "particular social group"). Whether Geovanni is a member of a particular group is a question of fact, to which we apply the substantial evidence test. *See Prasad*, 101 F.3d at 616–17. We first conclude that, as a matter of law, the appropriate "particular social group" is that group in Mexico made up of gay men with female sexual identities. Second, we conclude that the evidence compels the conclusion that Geovanni is a member of that group and was persecuted on account of his membership in that "particular social group."

### 1. *Defining "Particular Social Group"*

There is no definition of "particular social group" in the INA. The BIA, however, has recognized that the language comes directly from the United Nations Protocol Relating to the Status of Refugees ("Protocol"). *See Matter of Acosta*, 19 I. & N. Dec. 211, 232, 1985 WL 56042 (BIA 1985). When Congress ratified the Protocol on October 4, 1968, it did not shed any further light on the definition of "particular social group." *See Sanchez–Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir.1986).

▉ The case law regarding the definition of "particular social group" is not wholly consistent. In *Acosta*, 19 I. & N. Dec. at 233, 1985 WL 56042 the BIA interpreted "persecution on account of membership in a particular social group" to mean "persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic." The BIA explained that:

> The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as

former military leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.

*Id.* The BIA held that a group of taxi drivers did not meet the immutable characteristic requirement because an occupation can change; thus, driving a taxi is not fundamental to a person's identity. The BIA's interpretation is entitled to some deference. *See Arrieta v. INS*, 117 F.3d 429, 430 (9th Cir.1997) (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

The First, Third, and Seventh Circuits have adopted *Acosta*'s immutability analysis. *See Ananeh–Firempong v. INS*, 766 F.2d 621, 626 (1st Cir.1985) (recognizing *Acosta* in determining that family relations can be the basis of a "particular social group"); *Fatin*, 12 F.3d at 1239–41 (noting that the subgroup of Iranian feminists who refuse to conform to the government's gender-specific laws and social norms could satisfy the statutory concept of "particular social group") (internal quotation marks omitted); *Lwin v. INS*, 144 F.3d 505, 511–12 (7th Cir.1998) (recognizing parents of Burmese student dissidents as part of a social group because they share a "common, immutable characteristic").

In *Sanchez–Trujillo*, 801 F.2d at 1576, we acknowledged that the social group category "is a flexible one which extends broadly to encompass many groups who do not otherwise fall within the other catego-

ries of race, nationality, religion, or political opinion." We stated that:

"particular social group" implies a collection of people closely affiliated with each other, who are actuated by some common impulse or interest. Of central concern is the existence of a voluntary associational relationship among the purported members, which imparts some common characteristic that is fundamental to their identity as a member of that discrete social group.

*Id.* (footnote omitted).

The *Sanchez–Trujillo* court held that the class of working class, urban males of military age who maintained political neutrality in El Salvador did not constitute a "particular social group" for which the immigration laws provide protection from persecution. *See id.* at 1576–77 (indicating that cognizable groups cannot "encompass every broadly defined segment of a population" but should be a "small, readily identifiable group") (citations omitted).

We are the only circuit to suggest a "voluntary associational relationship" requirement. *Id.* at 1576. The Seventh Circuit has noted that this requirement "read literally, conflicts with *Acosta*'s immutability requirement." *Lwin*, 144 F.3d at 512. Moreover, in *Sanchez–Trujillo*, we recognized a group of family members as a "prototypical example" of a "particular social group." [4] 801 F.2d at 1576. Yet, biological family relationships are far from "voluntary." We cannot, therefore, interpret *Sanchez–Trujillo*'s "central concern" of a voluntary associational relationship strictly as applying to every qualifying "particular social group." For, as *Sanchez–Trujillo* itself recognizes, in some particular social groups, members of the group are not voluntarily associated by choice.[5]

---

4. We have since held that a family cannot constitute a particular social group under 8 U.S.C. § 1101(a)(42)(A). *See Estrada–Posadas v. United States INS*, 924 F.2d 916, 919 (9th Cir.1991).

5. Further, the statement in *Sanchez–Trujillo* that "[o]f central concern is the existence of a voluntary associational relationship among

the purported members," 801 F.2d at 1576, is not essential to the holding of the case that the group—non-political, young, urban males—was simply too "all-encompassing" to be "the type of cohesive, homogeneous group to which ... the term 'particular social group' was intended to apply." *Id.* A group, such as a family, can be cohesive and homo-

■ We thus hold that a "particular social group" is one united by a voluntary association, including a former association, *or* by an innate characteristic that is so fundamental to the identities or consciences of its members that members either cannot or should not be required to change it.[6]

### 2. *Sexual Identity as Basis for "Particular Social Group"*

Sexual orientation and sexual identity are immutable; they are so fundamental to one's identity that a person should not be required to abandon them. Many social and behavioral scientists "generally believe that sexual orientation is set in place at an early age." Suzanne B. Goldberg, *Give Me Liberty or Give Me Death: Political Asylum and the Global Persecution of Lesbians and Gay Men*, 26 Cornell Int'l L.J. 605, 614 n. 56 (1993). The American Psychological Association has condemned as unethical the attempted "conversion" of gays and lesbians. *See id.* Further, the American Psychiatric Association and the American Psychological Association have removed "homosexuality" from their lists of mental disorders. *See Boy Scouts of America v. Dale*, — U.S. —, 120 S.Ct. 2446, 2478, 147 L.Ed.2d 554 (2000) (Stevens, J. dissenting).

Sexual identity is inherent to one's very identity as a person. *See* Alfred Kinsey, et al., "Sexual Behavior in the Human Male," in *Cases and Materials on Sexual Orientation and the Law* 1, 7 (William B. Rubenstein ed., 2d ed., 1997) ("Even psychiatrists discuss 'the homosexual personality' and many of them believe that preferences for sexual partners of a particular sex are merely secondary manifestations of something that lies much deeper in the

totality of that intangible which they call the personality."); *cf. Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 35 (D.C. 1987) (observing that "homosexuality encompasses far more than people's sexual proclivities. Too often homosexuals have been viewed simply with reference to their sexual interests and activity. Usually the social context and psychological correlates of homosexual experience are largely ignored . . . ") (internal quotation marks and citations omitted). Sexual identity goes beyond sexual conduct and manifests itself outwardly, often through dress and appearance. *See* Kenji Yoshino, *Suspect Symbols: The Literary Argument for Heightened Scrutiny for Gays*, 96 Colum. L.Rev. 1753, 1775 n. 3 (1996) (defining gay identity as "the shared experience of having a sexual attachment to persons of the same sex and the oppression experienced because of that attachment"); Naomi Mezey, *Dismantling the Wall: Bisexuality and the Possibilities of Sexual Identity Classification Based on Acts*, 10 Berkeley Women's L.J. 98, 100–03 (1995) (discussing the relationship of identity and conduct in arguing that "[s]eparating the way we speak of sexual acts and sexual identities is crucial" and arguing that the traditional binary system of heterosexuals and homosexuals is too restrictive); *see also* Gilbert Herdt, *Same Sex, Different Cultures: Exploring Gay and Lesbian Lives* 20 (1997).

In *Gay Rights Coalition of Georgetown Univ. Law Ctr.*, the District of Columbia Court of Appeals noted that:

> [H]omosexuality is as deeply ingrained as heterosexuality.... [E]xclusive homosexuality probably is so deeply ingrained that one should not attempt or

geneous, without the existence of a voluntary associational relationship.

6. This formulation recognizes the holding of *Sanchez–Trujillo* and harmonizes it with *Acosta*'s immutability requirement. It is similar to the Supreme Court of Canada's definition of the term:

> A "particular social group" includes (1) groups defined by an innate or unchangea-

ble characteristic; (2) groups whose members voluntarily associate for reasons so fundamental to their human dignity that they should not be forced to forsake that association; and (3) groups associated by a former voluntary status, unalterable due to its historical importance.

*Canada (Attorney General) v. Ward* [1993] S.C.R. 689.

expect to change it. Rather, it would probably make far more sense simply to recognize it as a basic component of a person's core identity.

*Gay Rights Coalition of Georgetown Univ. Law Ctr.,* 536 A.2d at 34–35 (quoting A. Bell, M. Weinberg & S. Hammersmith, Sexual Preference—Its Development in Men and Women 190, 211 (1981)).

Under the BIA's decision in *Toboso–Alfonso,* 20 I. & N. Dec. 819, 820–23, 1990 WL 547189 (BIA 1990), sexual orientation can be the basis for establishing a "particular social group" for asylum purposes. In *Toboso–Alfonso,* the Cuban government had registered and tracked homosexual men for investigation over many years. *See id.* at 820–21. The INS did not contest that homosexuality is an immutable characteristic, and the BIA held that sexual orientation establishes membership in a "particular social group." *See id.* at 822–23. The Attorney General has designated the decision in *Toboso–Alfonso* to be "precedent in all proceedings involving the same issue or issues." Attorney General Order No. 1895 (June 19, 1994).

■ In determining that sexual orientation and sexual identity can be the basis for establishing a "particular social group," we also find persuasive the reasoning in *Matter of Tenorio,* No. A72–093–558 (IJ July 26, 1993). In *Tenorio,* the IJ granted asylum to a Brazilian gay man who had been beaten and stabbed by a group of people in Rio de Janeiro, who repeatedly used anti-gay epithets. The IJ found that Tenorio had a well-founded fear of future persecution due to his membership in a "particular social group" based on his sexual orientation. *See id.* at 11. The BIA adopted the IJ's reasoning and dismissed the INS' appeal. *See Matter of Tenorio,* No. A72–093–558 (BIA 1999) (per curiam). The BIA held that the IJ's decision "correctly concludes that the respondent has established persecution or a well-founded fear of future persecution on account of one of the five grounds enumerated" in the INA. *Id.*

### 3. *Particular Social Group of Gay Men with Female Sexual Identities in Mexico*

■ Based on the reasoning of the authorities discussed above, we conclude that the appropriate "particular social group" in this case is composed of gay men with female sexual identities in Mexico. Although not necessary to establish the "particular social group," the testimony of Professor Davies is helpful to our analysis. Professor Davies testified that gay men with female sexual identities in Mexico are "heavily persecuted by the police and other groups within the society. . . . [T]hey are a separate social entity within Latin American society and in this case within the nation of Mexico." Professor Davies expressly noted that as a subset of the gay male population, men with female sexual identities, are "ostracized from the beginning and [ ] subject to persecution, gay bashing as we would call it, and certainly police abuse."

We thus conclude that the BIA erred in defining the "particular social group" as "homosexual males who dress as females." Professor Davies did not testify that homosexual males are persecuted simply because they may dress as females or because they engage in homosexual acts. Rather, gay men with female sexual identities are singled out for persecution because they are perceived to assume the stereotypical "female," *i.e.,* passive, role in gay relationships. Gay men with female sexual identities outwardly manifest their identities through characteristics traditionally associated with women, such as feminine dress, long hair and fingernails.

Gay men with female sexual identities in Mexico are a "small, readily identifiable group." *Sanchez–Trujillo,* 801 F.2d at 1576 (citation omitted). Their female sexual identities unite this group of gay men, and their sexual identities are so fundamental to their human identities that they should not be required to change them. We therefore conclude as a matter of law that the "particular social group" in this

case is comprised of gay men with female sexual identities in Mexico.

### 4. *Geovanni's Membership*

■ We find that the evidence compels the conclusion that Geovanni is a member of the "particular social group" of gay men in Mexico with female sexual identities. Professor Davies specifically classified Geovanni as "a homosexual who has taken on a primarily 'female' sexual role."[7] Geovanni has known that he was gay from the age of eight and began dressing as a woman when he was 12. He socialized with other gay boys in school, which led to his eventual expulsion. The BIA found that the police "temporarily detained [him] for walking the street and socializing with other young homosexual men." He was sexually assaulted twice by the police. After placing him in a therapy program to "convert" his sexuality, his sister eventually "realized that I was the same and the only thing that had changed was the fact that they had cut my hair and cut my nails." Geovanni's female sexual identity must be fundamental, or he would not have suffered this persecution and would have changed years ago. *See Fatin,* 12 F.3d at 1241 (noting that "if a woman's opposition to the Iranian laws in question is so profound that she would choose to suffer the severe consequences of noncompliance, her beliefs may well be characterized as 'so fundamental to [her] identity or conscience that [they] ought not be required to change it'") (quoting *Acosta,* 19 I. & N. Dec. at 234, 1985 WL 56042).

Geovanni should not be required to change his sexual orientation or identity. *See Acosta,* 19 I. & N. Dec. at 234, 1985 WL 56042; *Tenorio,* No. A72–093–558 (IJ) at 14 ("Sexual orientation is arguably an immutable characteristic, and one which an asylum applicant should not be compelled to change."). Because we conclude that Geovanni should not be required to change his sexual orientation or identity, we need not address whether Geovanni could change them. Geovanni's credible and uncontradicted testimony about the inherent and immutable nature of his sexual identity compels the conclusion that Geovanni was a member of the particular social group of gay men in Mexico with female sexual identities.

The BIA erroneously concluded that "tenor of [Geovanni's] claim is that he was mistreated because of the way he dressed (as a male prostitute) and not because he is a homosexual." This statement is not supported by substantial evidence; in fact, it is wholly unsupported by any evidence in the record. There is no evidence that Geovanni was a male prostitute, and we do not venture to guess the non-record basis of the BIA's assumption of how a male prostitute dresses.[8]

The BIA stressed that Geovanni could not remember how he was dressed on one occasion when he was arrested crossing the border between the United States and Mexico. The BIA, therefore, agreed with the IJ that "the decision to dress as a female was a volitional act, not an immutable trait." Geovanni did testify that he

7. In addition to being a gay man with a female sexual identity, Geovanni's brief states that he "may be considered a transsexual." A transsexual is "a person who is genetically and physically a member of one sex but has a deep-seated psychological conviction that he or she belongs, or ought to belong, to the opposite sex, a conviction which may in some cases result in the individual's decision to undergo surgery in order to physically modify his or her sex organs to resemble those of the opposite sex." Deborah Tussey, *Transvestism or Transsexualism of Spouse as Justifying Divorce,* 82 A.L.R.3d n. 2 (2000); *see Farmer v. Haas,* 990 F.2d 319, 320 (7th Cir.1993) (Pos-

ner, J.) ("The disjunction between sexual identity and sexual organs is a source of acute psychological suffering that can, in some cases anyway, be cured or at least alleviated by sex reassignment—the complex of procedures loosely referred to as 'a sex-change operation.'"). We need not consider in this case whether transsexuals constitute a particular social group.

8. The only explicit reference to prostitution in the record is the INS attorney's question to Geovanni about whether he had ever worked as "a homosexual prostitute in the United States." Geovanni answered that he had not.

dresses as a man when he is going to a place where an effeminate style of dress would not be appropriate. That Geovanni could not remember how he was dressed on one occasion several years before does not support the BIA's conclusion that, because Geovanni can change his clothes, he can change his identity as quickly as the taxi drivers in *Acosta* can change jobs.

This case is about sexual identity, not fashion. Geovanni is not simply a transvestite "who dresses in clothing of the opposite sex for psychological reasons." *American Heritage Dictionary* 1289 (2d Coll. Ed.) (1985). Rather, Geovanni manifests his sexual orientation by adopting gendered traits characteristically associated with women.

### D. *"On Account Of"*

■■■ Geovanni must show that he was persecuted "on account of" his "membership in the particular social group." INA § 101(a)(42)(A); 8 U.S.C. § 1101(a)(42)(A). In satisfying the "on account of" requirement, the evidence compels a finding that Geovanni's sexual identity was a significant motivation for the violence and abuse he endured. *See Lopez–Galarza v. INS*, 99 F.3d 954, 959 (9th Cir.1996) (holding that the petitioner must present "some evidence, direct or circumstantial, of the persecutor's motive, since 8 U.S.C. § 1101 requires 'persecution on account of' various characteristics"); *see also INS v. Elias–Zacarias*, 502 U.S. 478, 483, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *Pitcherskaia v. INS*, 118 F.3d 641, 647 (9th Cir.1997). The BIA explicitly noted that Geovanni was "stopped on numerous occasions … and temporarily detained for walking the street and socializing with other young homosexual men." The police were not going after people with long hair and nails, or everyone dressed in female clothing. Geovanni was sexually assaulted because of his outward manifestations of his sexual orientation.

The government's legal reasoning is unpersuasive when it argues that "the evidence does not compel the conclusion that the mistreatment [Geovanni] suffered by Mexican authorities was solely on account of his homosexual status." Geovanni is not required to prove that his persecutors were motivated by his sexual orientation to the exclusion of all other possible motivations. *See Briones v. INS*, 175 F.3d 727, 729 (9th Cir.1999) (en banc); *Borja v. INS*, 175 F.3d 732, 735 (9th Cir.1999) (en banc). We have recognized that "persecutory conduct may have more than one motive, and so long as one motive is of one of the statutorily enumerated grounds, the requirements [for asylum] have been satisfied." *Singh v. Ilchert*, 63 F.3d 1501, 1509–10 (9th Cir.1995); *see Osorio v. INS*, 18 F.3d 1017, 1028 (2d Cir.1994) ("The plain meaning of the phrase 'persecution on account of the victim's political opinion,' does not mean persecution *solely* on account of the victim's political opinion.") (emphasis in original).

Professor Davies' testimony and the accompanying evidence highlight that the persecution Geovanni suffered was "on account of" his membership in the "particular social group" of men with female sexual identities in Mexico. *Cf. Ramirez Rivas v. INS*, 899 F.2d 864, 873 (9th Cir.1990) (relying on "highly persuasive" expert testimony to find a clear probability of future persecution for withholding of deportation), *vacated on other grounds*, 502 U.S. 1025, 112 S.Ct. 858, 116 L.Ed.2d 766 (1992). Professor Davies testified that gay men with female sexual identities are recognized in Mexico as a distinct and readily identifiable group and are persecuted for their membership in that group. He testified that the police attack and even rape men with female sexual identities.

Attached to Professor Davies's declaration are numerous articles and reports documenting the violence against gay men in Mexico and throughout Latin America. A co-founder and general coordinator of a Mexican human rights organization stated: "The government has said it will not protect transvestites unless they are dressed like men, insinuating that it is okay to kill homosexuals if they are visible." *Anti-*

*Queer Violence Continues in Mexico,* S.F. Bay Times, Feb. 25, 1993. There was also a *New York Times* article, documenting the granting of asylum to a gay man from Mexico. *See Gay Man Who Cited Abuse in Mexico is Granted Asylum,* N.Y. Times, March 26, 1994 at A5. The man had been arrested in Mexico for going to certain neighborhoods, attending certain parties and patronizing certain bars. The police falsely accused him of crimes, extorted him, and on one occasion, raped him. *See id.*

Also in evidence was an advisory opinion about Geovanni's case by the Office of Asylum Affairs of the United States Department of State, claiming that: "[o]ur Embassy in Mexico advises us that it has no evidence of the systematic persecution of homosexuals there although *random violence against homosexuals has occurred.*" (emphasis added). This evidence along with Geovanni's testimony compels the conclusion that Geovanni was persecuted "on account of" his membership in the "particular social group." The evidence is susceptible of no other conclusion.

### E. *Persecution*

■ The BIA legally erred in finding that Geovanni failed to establish both past persecution and a well-founded fear of future persecution upon return to Mexico. *See* INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A); *see also Pitcherskaia,* 118 F.3d at 646 (reviewing de novo the legal question of the meaning of persecution). We have held that persecution involves "the infliction of suffering or harm upon those who differ . . . in a way regarded as offensive." *Desir v. Ilchert,* 840 F.2d 723, 726–27 (9th Cir.1988) (internal quotation mark and citation omitted); *see Hernandez–Ortiz v. INS,* 777 F.2d 509, 516 (9th Cir.1985) (stating that persecution is "oppression . . . inflicted on groups or individuals because of a difference that the persecutor will not tolerate").

■ Geovanni must show that the persecution he suffered was "inflicted either by the government or by persons or orga-

nizations which the government is unable or unwilling to control." *Sangha v. INS,* 103 F.3d 1482, 1487 (9th Cir.1997). The BIA was misguided when it concluded that Geovanni was not persecuted "even if the Mexican authorities give low priority to protection of gays." In this case, it was the police who actually perpetrated the violence. During the first sexual attack, Geovanni was abducted, ordered to remove his clothes, and forced to perform oral sex on the officer. The officer then told Geovanni that he would go to jail if he told anyone about the rape. During the second assault, Geovanni and a friend were abducted by two officers, driven to a secluded area, and ordered to remove their clothing. One officer sodomized Geovanni as he held a gun to his temple. Given these past assaults, Geovanni "is at risk of persecution at the hand of the very agency which purports to protect him by law . . . ." *In re Inaudi,* No. T91–04459 (Immigration and Refugee Board of Canada Apr. 9, 1992).

The sexual assaults Geovanni suffered at the hands of police officers undoubtedly constitute persecution. We have held that "rape or sexual assault . . . may constitute persecution." *Lopez–Galarza,* 99 F.3d at 959; *see Lazo–Majano v. INS,* 813 F.2d 1432, 1434 (9th Cir.1987) (finding persecution of a woman who was raped by a military sergeant whose clothing she was paid to wash), *overruled on other grounds, Fisher v. INS,* 79 F.3d 955, 961 (9th Cir. 1996) (en banc). In *Lopez–Galarza,* we took note of:

the numerous studies revealing the physical and psychological harms rape causes. A recent article in the *Journal of the American Medical Association* summarized several studies of the effects of rape, and concluded:

Rape commonly results in severe and long-lasting psychological sequelae that are complex and shaped by the particular social and cultural context in which the rape occurs. . . . Commonly reported feelings at the time of

the rape include shock, a fear of injury or death that can be paralyzing, and a sense of profound loss of control over one's life. Longer-term effects can include persistent fears, avoidance of situations that trigger memories of the violation, profound feelings of shame, difficulty remembering events, intrusive thoughts of the abuse, decreased ability to respond to life generally, and difficulty reestablishing intimate relationships.

*Lopez–Galarza*, 99 F.3d at 962 (citation omitted). There is no reason to believe that the trauma for male victims of rape is any less severe than for female victims.[9]

The BIA gave the convoluted, inapposite, and irrelevant reasoning that "[w]hile *Toboso–Alfonso, supra*, provides a basis for finding that homosexuality is a basis for asylum, anti-sodomy laws are not persecution. *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986)." Geovanni did not argue, however, that he was being persecuted because of the prohibition of any anti-sodomy laws. Instead, he was raped twice by police officers who forced him to engage in sodomy. *Bowers* has no relevance to this case, and the BIA's reliance on that case is completely misplaced.

Further, the BIA erroneously reasoned that "the respondent's mistreatment arose from his conduct ... thus the rape by the policemen, and the attack by a mob of gay bashers are not necessarily persecution...." We are uncertain whether by "conduct" the BIA was referring to some alleged criminal conduct or to Geovanni's appearance and style of dress. Either way, substantial evidence compels a contrary result. *See Prasad*, 101 F.3d at 616–17.

There is absolutely no evidence in the record that Geovanni's "mistreatment arose from his conduct," if conduct refers to criminal activity. There is no evidence

in the record of any past convictions. In fact, the IJ explicitly noted that, despite police harassment in Mexico, Geovanni had "never been formally charged or convicted of any offense."

Perhaps, then, by "conduct," the BIA was referring to Geovanni's effeminate dress or his sexual orientation as a gay man, as a justification for the police officers' raping him. The "you asked for it" excuse for rape is offensive to this court and has been discounted by courts and commentators alike. *See e.g., Timm v. Delong*, 59 F.Supp.2d 944, 959–60 (D.Neb. 1998) (stating that Congress found that almost one quarter of state judges erroneously believe that rape victims precipitate their sexual assaults because of what they wear or their actions preceding the incidents); Katharine K. Baker, *Once a Rapist? Motivational Evidence and Relevancy in Rape Law*, 110 Harv. L.Rev. 563, 622 (1997) (constructing new ways to evaluate rape cases that will not blame the victim); Judith M. Billing & Brenda Murray, *Introduction to the Ninth Circuit Gender Bias Task Force Report: The Effects of Gender*, 67 S. Cal. L.Rev. 739, 741 (1994) (stating that blaming women for bringing domestic violence on themselves is a common example of gender bias in the courts).

■ Further, the BIA had no basis for concluding that Geovanni's failure to respond to questions regarding his arrests in the United States "casts further doubt on his claim of persecution." It is true that "[t]here is no rule of law which prohibits officers charged with the administration of the immigration law from drawing an inference from the silence of one who is called upon to speak." *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1043, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) (citing *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54, 44 S.Ct. 54, 68 L.Ed. 221

---

9. Because we find that the two sexual assaults and accompanying police harassment constitute persecution, we need not examine Geovanni's additional claims that his expulsion from school, random stops by the police, and the knife assault by the group constitute persecution, individually and cumulatively.

(1923) (Brandeis, J.)). Any inference to be drawn, however, must be reasonable. There simply is no logical connection between Geovanni's failure to answer questions regarding arrests in the United States and the rapes by police officers in Mexico.

██ Because Geovanni has established past persecution, there is a presumption that he has a well-founded fear of future persecution, which the INS must overcome by a preponderance of the evidence that country conditions have changed. *See* 8 C.F.R. § 208.13(b)(1)(i); *Singh*, 63 F.3d at 1510–11. The INS presented no evidence that Mexico has taken effective steps to curb sexual orientation-based violence, including that perpetrated by the police. To the contrary, Professor Davies testified that the situation for gay men in Mexico has worsened because of the decline of the economy. Thus, the presumption must be given its full force.

### F. *Withholding of Deportation*

██ Our analysis of past persecution also triggers a presumption that Geovanni has shown a "clear probability" of future persecution with respect to his withholding claim—a presumption that the INS may also rebut by an individualized showing of changed country conditions. *See* 8 C.F.R. § 208.16(b)(1); *Vallecillo–Castillo v. INS*, 121 F.3d 1237, 1240 (9th Cir.1996). Again, there is nothing in the record to rebut that presumption. Accordingly, we conclude that Geovanni is also entitled to withholding of deportation.[10]

### V. CONCLUSION

We hold that the BIA's decision denying Geovanni asylum on statutory grounds is fatally flawed as a matter of law and is not supported by substantial evidence.

Through police harassment and rape, Geovanni suffered past persecution in Mexico on account of his sexual orientation for being a gay man with a female sexual identity. Because that showing is unrebutted, we must presume that he has a well-founded fear of persecution if he returns. He is entitled to asylum and withholding of deportation. We therefore grant the petition for review and remand the case to the BIA with instructions to grant his application for withholding of deportation and to present this case to the Attorney General for the exercise of her discretion to grant asylum.

**PETITION FOR REVIEW GRANTED and REMANDED with instructions.**

BRUNETTI, Circuit Judge, specially concurring:

The majority's conclusion that Geovanni Hernandez–Montiel is entitled to asylum and withholding of deportation is correct. I do not agree, however, with the broad reasoning and rationale used by the majority in reaching its conclusion. I therefore must concur only in the result reached by the majority.

The evidence presented by Professor Davies supports the legal conclusion that in Mexico, gay men who have female sexual identities constitute a particular social group for asylum purposes. Hernandez–Montiel's uncontradicted testimony regarding his physical and mental state is sufficient to establish that he is a member of this particular social group. Professor Davies testified that gay men with female sexual identities are persecuted in Mexico. Hernandez–Montiel's testimony before the Immigration Judge that he suffered persecution on account of his membership in this social group was found credible by

10. Geovanni argues further that the IJ erred in denying asylum on discretionary grounds based on Geovanni's refusal to answer certain questions regarding his alleged criminal conduct in the United States. Geovanni argues that the BIA adopted this finding when it "conclude[d], as did the Immigration Judge, that the respondent is not entitled to a favor-

able exercise of discretion." The BIA's comment, however, was made in the context of its discussion of voluntary departure. The BIA did not address the IJ's denial of asylum on discretionary grounds; thus, we cannot review it. *See Gonzalez*, 82 F.3d at 907; *Ghaly v. INS*, 58 F.3d 1425, 1430 (9th Cir.1995).

both the Immigration Judge and the Board of Immigration Appeals. Hernandez–Montiel is therefore entitled to asylum and withholding of deportation based on his well-founded fear of persecution should he be returned to Mexico.