BARKETT, Circuit Judge,
dissenting:
The only question before us in this case is whether the attacks and harassment Garcia suffered at the hands of the National Liberation Army (“ELN”) were “on account of’ a statutorily protected ground.[1] There are five such protected grounds: race, religion, nationality, or membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A). Here, Garcia alleges that she was persecuted on *861 account of her membership in a particular social group—the elite, landowning cattle ranchers targeted by Marxist groups such as the ELN—and her political opinion, which opposed the ELN’s methods and goals.
I believe the majority erroneously characterizes the harassment and attacks that Garcia suffered as nothing more than attempted extortion by the ELN. This reading is belied by the record evidence, and ignores the political and social import of the guerrillas’ demands. Indeed, the majority’s approach essentially transforms Colombia’s political and social violence into nothing more than an extended crime wave, despite the fact that the IJ himself characterized it as 40-year-long “civil war” between the government and guerrillas. The latter characterization accurately captures the reality of the situation in Colombia, because it acknowledges that Colombian guerrilla forces such as the ELN seek not just profit, but political control. Individuals caught in the middle of the struggle, as Garcia was, often find themselves the victims of political violence, not just crime. Indeed, according to one former Colombian judge, Colombia’s current conflict “has its roots in political violence that has existed not far below the surface of Colombian society since the nation’s founding in the 1820s.” Luz E. Nagle, Colombian Asylum Seekers: What Practitioners Should Know About the Colombian Crisis, 18 Geo. Immigr. L.J. 441, 443-44 (2004) (emphasis added). The country’s political volatility has always tracked the fault lines between the Conservative Party—which tends to represent landowners, the urban elite, and rural patrician families—and the Liberal Party, which generally represents leftists, laborers, and much of the rural peasantry.[2] Id. at 444.
From this simmering cauldron, Colombia’s two major guerrilla groups—the ELN and the Revolutionary Armed Forces of Colombia (“FARC”)—emerged in the 1960s as the radicalized leftist by-products of a ten-year de facto civil war between liberals and conservatives known as La Violencia. Jose E. Arvelo, Note, International Law and Conflict Resolution in Colombia: Balancing Peace and Justice in the Paramilitary Demobilization Process, 37 Geo. J. Int’l L. 411, 416 (2006). The FARC and ELN both claim to represent the rural poor against Colombia’s wealthy classes and oppose American influence in Colombia, the privatization of natural resources, and multinational corporations. In order to advance their political goals, they have struggled to seize power from— and in some areas effectively replace—the precarious national government. William D. Shingleton, Understanding Colombia, 25 Fletcher F. World Aff. 255, 260 (2001).
The ELN was founded in 1963 by “Catholic radicals and left-wing intellectuals hoping to emulate Fidel Castro’s communist revolution in Cuba.” Counsel on Foreign Relations, FARC, ELN, AUC (Colombia, Rebels) (Nov. 2005), available at http:/Avww.cfr.org/publication/9272/. It has been called Colombia’s “only guerrilla group with a bona fide Marxist pedigree.” Nagle, Colombian Asylum Seekers, at 450. In keeping with its leftist origins, the group’s “main issue has been traditionally the exploitation of the country’s natural resources, especially its petroleum reserves by state companies and foreign multinationals.” Arturo Carrillo-Suarez, Hors de Logique: Contemporary Issues in *862 International Humanitarian Law as Applied to Internal Armed Conflict, 15 Am. U. Int’l L.Rev. 1, 1 (1999). In recent years, however, the ELN has also made demands for “more general political and economic reforms, in addition to the nationalization of natural resources.” Id. at 16 (internal citation omitted).
In order to achieve their political ends, the FARC and ELN have increasingly embraced a campaign of countrywide violence and crime. As the IJ noted, the “guerrillas operatives finance their operations” in Colombia’s “civil war” through “not only drug trafficking but also through the extortion of funds from wealthy individuals in Colombia and through the payment of ransom for kidnaped victims.” The guerrillas see these extortive “war taxes” (known as vacuna) as both a source of income and a political test, and often attack those who refuse to pay them, as Garcia learned firsthand. As the Third Circuit recently recognized, “[rjefusal or inability to pay these war taxes is viewed as an act of political opposition as often results in reprisal.” Amaya Arias v. U.S. Att’y Gen., 143 Fed.Appx. 464, 465 (3d Cir.2005) (considering claims of a Colombian asylum seeker from Barranquilla). The ELN backs its demands with violence, particularly against landowners and the petroleum industries, both of which represent the foreign-dominated capitalism the group opposes.
Given the ideological bent of the ELN, it is not enough to say, as the IJ did here, that the guerrillas who targeted Garcia and her family were “not interested in them as a particular social group but were only interested to obtain money from individuals they thought were able to pay.” To the contrary, Garcia and her family represent the very “social group” to which the ELN has been implacably and violently opposed for more than 40 years: the landowning elite. The majority notes that “a group defined solely by their wealth is unsufficiently narrow to constitute a protected class for asylum purposes.” Op. at page 858-59 (internal citations omitted). This may be true, but it is also irrelevant, because Garcia’s social group was not defined “solely” by her wealth, but by the same factors—including “land ownership”—set out in the leading cases defining “particular social group” for the purposes of asylum. See, e.g., Matter of Acosta, 19 I. & N. Dec. 211, 233 (BIA 1985).
Acosta is the leading BIA case defining “persecution on account of membership in a particular social group.” It holds the phrase to mean “persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic” including “a shared past experience such as former military leadership or land ownership.” (emphasis added).[3] Acosta, 19 I. & N. Dec. at 233. The Acosta definition of “social group” has been adopted by several Courts of Appeals. See, e.g., Lukwago v. Ashcroft, 329 F.3d 157, 171 (3d Cir.2003); Lwin v. INS, 144 F.3d 505, 512 (7th Cir. 1998). Applying that definition to cases involving landowning Colombian cattle-ranchers, our sister circuits have found them to constitute a “social group” that, in *863 the Seventh Circuit’s words, “is not defined merely by wealth ... but by their ownership of land, their social position as cattle farmers, and their education.” Tapiaro de Orejuela v. Gonzales, 423 F.3d 666, 672 (7th Cir.2005) (granting asylum). The Third Circuit faced a similar issue in Ramirez v. Attorney General, 187 Fed.Appx. 228 (3d Cir.2006). In that case, a Colombian businessman and landowner claimed to have been persecuted by the FARC based on his socioeconomic class. As in Garcia’s case, the IJ and BIA failed to reach Ramirez’s social group claim, finding instead that he was targeted for purely “economic” reasons. Id. at 230. Noting the Seventh Circuit’s opinion in Orejuela, the Third Circuit remanded to the BIA to consider whether Ramirez’s status as a businessman and landowner made him part of a “social group” targeted by the FARC. Id. at 231; see also Ucelo-Gomez v. Gonzales, 448 F.3d 180, 187-88 (2d Cir. 2006) (remanding to the BIA for a determination whether “affluent Guatemalans” constitute “a particular social group”). I would follow the well-considered analysis of our sister circuits here.
The majority distinguishes Orejuela and Ramirez on the grounds that “[i]n both Orejuela and Ramirez, the guerrillas specifically communicated that their threats and demands were made on the aliens because they were educated and landowners.” The threats and demands the majority quotes from those cases, however, are no more specific than those that Garcia received. See Orejuela, 423 F.3d at 672 (noting that one family member “was told by the FARC guerillas that [the threats were] because his family belonged to a ‘privileged group’ and that he and his brothers had gone to schools and universities; ... [and] because his father was ‘renowned’ as a cattle rancher”); Ramirez, 187 Fed.Appx. at 229 (referring to a letter from FARC demanding money from applicant that stated, “We are aware that your properties and businesses are located in our areas of operations. Because of this, it is necessary to undertake some form of collaboration.... ”). Here, the ELN told Garcia in July and August 2001 that she would pay the war tax with either money or blood, and that the payment was the cost “for being exploiters of the proletarian people of Colombia.” Whether this threat evinced animus towards Garcia’s position in the landowning capitalist elite (her social group) or a “political opinion” imputed to that group is immaterial, since Garcia claimed asylum on both grounds.
It seems that the ELN targeted the Garcias in part because they were affluent enough to pay the war tax. However, Garcia need not show that the persecution she suffered was “based solely on account of a protected ground” such as her social group or imputed political opinion. Garcia-Valderrama v. U.S. Att’y Gen., 130 Fed.Appx. 434, 436 (11th Cir.2005) (reversing and remanding BIA determination that Colombian petitioner, who had been persecuted by FARC, suffered that persecution at least in part on account of his political opinion). If an asylum applicant “can show that the persecution was, at least in part, motivated by a protected ground, then the applicant can establish eligibility for asylum.” Id. In Colombia, which is wracked by violent divisions based on class, and where Marxist groups subscribe to a political ideology that is explicitly based on class, cattle-ranchers and landowners face socially and politically motivated violence as well as financial extortion.
Garcia also argues that she is entitled to asylum because she was persecuted on account of her political opinion. In denying Garcia’s petition, the IJ relied on an erroneously narrow reading of “political opinion.” The majority repeats that error. In INS v. Elias-Zacarias, the Supreme *864 Court held that when an asylum applicant claims to have been persecuted due to a political opinion, the focus must be on the “victim’s political opinion, not the persecutor’s,” and that resisting a guerrilla organization is not by itself proof of the resister’s political opinion. 502 U.S. 478, 482, 483, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); see also Sanchez v. U.S. Att’y Gen., 392 F.3d 434, 438-39 (11th Cir.2004) (citing Elias-Zacarias, 502 U.S. at 482, 112 S.Ct. 812). The Court found that an asylum-seeker must prove that he had a political opinion—or that one was imputed to him—and also a well-founded fear “that the guerrillas will persecute him because of that political opinion, rather than because of his refusal to fight with them.” Id. at 483, 112 S.Ct. 812.
Elias-Zacarias does not, however, foreclose “political opinion” claims by petitioners whose actions demonstrate (even if just in the minds of their persecutors) both a political opinion and a desire to protect themselves. Reading the case otherwise would essentially require a petitioner to demonstrate that he or she was solely expressing a political opinion (which is a protected ground), without regard for personal safety (which is not). This is both illogical and contrary to our caselaw, which provides that asylum seekers need not show that the persecution they suffered was “based solely on account of a protected ground.” Garcia-Valderrama, 130 Fed.Appx. at 435. See also Borja v. INS, 175 F.3d 732, 735-36 (9th Cir.1999) (en banc); Osorio v. INS, 18 F.3d 1017, 1028 (2d Cir.1994) (“The plain meaning of the phrase ‘persecution on account of the victim’s political opinion,’ does not mean persecution solely on account of the victim’s political opinion.”).
The petitioner in Elias-Zacarias failed to show that his actions were even partially motivated by his political opinion. Indeed, he testified to just the opposite: his sole reason for resisting the guerrillas was fear of retribution by the government. Elias-Zacarias, 502 U.S. at 482, 112 S.Ct. 812. Nor was there any evidence that the guerrillas imputed a political opinion to him based on his refusal to cooperate. Id. Unlike Elias-Zacarias, however, Garcia argues that she was targeted on account of both her expressed and her imputed political opinion. She first argues that the ELN persecuted her because she explicitly expressed her political opposition to the group by refusing to give in to its demands, advocating for an increased military presence in the region, encouraging local cattle-ranchers to cooperate in the interests of self-protection, and reporting the ELN’s threats to an anti-kidnaping organization.[4] The fact that Garcia simultaneously tried to protect herself and her family does not mean that her actions were not also a manifestation of her political beliefs. Indeed, asylum is designed to protect those whose safety is threatened on account of their political views. We undermine the purpose of those laws when we deny asylum to those whose political opinions happen to be aligned with their personal safety.
Moreover, as the majority correctly notes, “a political opinion may be mistakenly ‘imputed’ to the applicant by the persecutor.” As we have recognized, “[a]n imputed political opinion, whether correctly or incorrectly attributed, may constitute *865 a ground for a well-founded fear of political persecution within the meaning of the INA.” Al Najjar, 257 F.3d at 1289 (quotation marks and citation omitted). The majority disregards the record evidence that the ELN imputed a political opinion to Garcia and persecuted her because of it. The record demonstrates that the ELN explicitly viewed opposition to the war tax as a political act, not simply a refusal to fund its activities. In the summer of 2001, just before Garcia fled Colombia, ELN agents told her that she would pay the tax with either money or blood, and that it was a payment for exploiting the proletarian people of Colombia. The guerrillas thus clearly characterized the war tax not simply as a means to obtain money, but as a political act in line with their professed Marxist revolutionary ideals. Indeed, as the Third Circuit recognized in a similar Colombian asylum case, “[rjefusal or inability to pay these war taxes is viewed as an act of political opposition and often results in reprisal.” Amaya Arias, 143 Fed.Appx. at 465 (emphasis added). Landowners and cattle ranchers may of course be specially targeted on account of their wealth, but not solely because the ELN is motivated by criminal greed. Rather, their occupations and wealth make them representatives of a capitalist mindset—a “political opinion”—to which the ELN is avowedly and violently opposed.
The IJ, without determining whether the guerrillas’ actions in this case amounted to persecution, found that any persecution Garcia suffered was not “on account of’ a protected ground. By characterizing the attacks and threats as merely criminal in the face of record evidence to the contrary, the majority, like the IJ, abdicates the duty conduct the “case-by-case adjudication” required to determine whether Garcia has a “well-founded fear” of persecution. INS v. Cardoza-Fonseca, 480 U.S. 421, 448, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Because I would find that the record compels the conclusion that Garcia was targeted based on two protected grounds—her membership in a social group and her political opinion—I respectfully dissent.

. The majority erroneously refers to “the IJ’s determination that Garcia was not persecuted.” The IJ made no such determination. Because it dismissed Garcia's petition by finding no nexus between the mistreatment she suffered and any protected ground, the IJ did not consider whether that mistreatment amounted to "persecution.” It did, however, find Garcia to be a credible witness.

. Sixty percent of Colombians live in poverty, while less than one percent of the population—generally the large landowners affiliated with the Conservative Party—owns the majority of the land. Luz E. Nagle, Colombia’s Legal War Against Illegal Armed Groups, 15 Transnat’l L. & Contemp. Probs. 5, 10 (2005).

. The Second and Ninth Circuits have adopted definitions which are even broader. See Gomez v. INS, 947 F.2d 660, 664 (2d Cir.1991) (defining a “particular social group” as "individuals who possess some fundamental characteristic in common which serves to distinguish them in the eyes of the persecutor—or in the eyes of the outside world in general"); Hernandez-Montiel v. INS, 225 F.3d 1084, 1093 (9th Cir.2000) (defining “particular social group” as one brought together either by voluntary association, including a former association, or by an innate characteristic so fundamental that its members either cannot or should not be required to change it).

. The majority acknowledges that Garcia's testimony was “consistent with her imputed political claim” but concludes that it "does not compel this Court to conclude that the IJ erred.” Since this evidence, even under the majority’s reading, demonstrates that the persecution Garcia suffered was, "at least in part, motivated by a protected ground,” Garcia-Valderrama, 130 Fed.Appx. at 436, I would regard the IJ's misreading as an error of law warranting reversal.