99 F.3d 954
 96 Cal. Daily Op. Serv. 8143, 96 Daily Journal
D.A.R. 13,541
Mercedes Lina LOPEZ-GALARZA; Raul Jose Hernandez-Lopez, Petitioners,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 94-70683.
 United States Court of Appeals,
Ninth Circuit.
 Submitted March 15, 1996.*
Decided Nov. 8, 1996.
 
 Charles E. Nichol, San Francisco, CA, for petitioners.
 Francesco Isgro, Office of Immigration Litigation, United States Department of Justice, Washington, DC, for respondent.
 Petition for Review of an Order of the Board of Immigration Appeals. INS Nos. Abi-rks-tfk, Aih-eue-lou.
 Before: BEEZER and HAWKINS, Circuit Judges, and ZILLY,** District Judge.
 Opinion by Judge MICHAEL DALY HAWKINS; Concurrence by Judge BEEZER.
 MICHAEL DALY HAWKINS, Circuit Judge:
 
 
 1
 Mercedes Lina Lopez-Galarza and her son, Raul Jose Hernandez-Lopez, petition for review of the final order of deportation of the Board of Immigration Appeals ("the BIA"). We have jurisdiction pursuant to 8 U.S.C. § 1105a(a), and we grant the petition. We hold that Lopez-Galarza has demonstrated past persecution sufficient to establish eligibility for asylum, and we remand to the BIA for a determination of whether she and her son are entitled to asylum as a matter of discretion.
 
 FACTUAL AND PROCEDURAL HISTORY
 
 2
 Petitioner is a 32-year-old native and citizen of Nicaragua. Her 7-year-old son seeks derivative asylee status pursuant to 8 U.S.C. § 1158(c). Lopez-Galarza and her son concede deportability under 8 U.S.C. § 1251(a)(1)(B) (entry without inspection), but seek asylum under 8 U.S.C. § 1158(a) or withholding of deportation under 8 U.S.C. § 1253(h) based on the experiences of Lopez-Galarza and her family.
 
 
 3
 Lopez-Galarza's father, Julio Alfredo Lopez, was an officer of the National Guard during the Somoza era. Because of his affiliation with the Somoza regime, the Sandinistas arrested him when they assumed power in 1979. He was convicted of unspecified crimes and sentenced to at least 23 years in prison. While in prison, he was tortured physically and mentally by the Sandinistas. Although he was released in 1986 due to illness, he remained under house arrest while the Sandinistas held power.
 
 
 4
 In 1981, when Lopez-Galarza was 18, her neighbor, a member of the Sandinista military, accused her of supporting the counter-revolutionary contras, an accusation she attributes to her father's affiliation with the Somoza regime. Lopez-Galarza was taken from her home by Sandinista military officers to a police station, where she was imprisoned for 15 days. During that period, Lopez-Galarza was raped repeatedly, confined in a jail cell for long periods without food, forced to clean the bathrooms and floors of the men's jail cells, and subjected to other forms of physical abuse. Lopez-Galarza was eventually released.
 
 
 5
 In the years following her release, Lopez-Galarza and her family were subjected to additional mistreatment. Pro-Sandinista mobs stoned and vandalized their house, painted "Death to the contras" on the house, and threatened to drive the family out. Lopez-Galarza attributes this mistreatment to her family's refusal, for ideological reasons, to join the "Committees for the Defense of the Sandinistas" ("CDS"). The CDS, which controlled food rations under the Sandinista regime, took away the family's ration card when Lopez-Galarza's mother left the country and could no longer attend CDS meetings to obtain ration cards. The family was then forced to buy food on the black market. Lopez-Galarza was able, however, to secure a job at a state-owned hospital.
 
 
 6
 Several members of Lopez-Galarza's family fled Nicaragua during the years of Sandinista rule. Her mother left in 1987, and was granted asylum in the United States in November 1988. Lopez-Galarza's husband and eldest son fled in 1988.[1] Lopez-Galarza was unable to accompany them because she had a second son who was only two months old at the time. Another obstacle to her departure was the Nicaraguan immigration officials' refusal to issue Lopez-Galarza a passport to leave the country. Eventually obtaining a passport by bribing an official, Lopez-Galarza and her son entered the United States without inspection in April 1989.
 
 
 7
 Five months later, Lopez-Galarza and her son sought relief from deportation by applying for asylum under 8 U.S.C. § 1158(a) or withholding of deportation under 8 U.S.C. § 1253(h). Lopez-Galarza's application for asylum and her affidavits stated that she feared future persecution in Nicaragua because she and her family had been persecuted by the Sandinistas on account of her father's role in the Somoza government. She recounted her imprisonment, rape, and other abuse in an affidavit. At hearings in March and September 1990, Lopez-Galarza testified to the events described above, and submitted letters from her father stating that he still experiences harassment by the Sandinistas, despite their defeat in the presidential elections of 1990. Lopez-Galarza's half-sister,[2] an eyewitness to Lopez-Galarza's arrest, testified at the deportation hearing, corroborating Lopez-Galarza's testimonial account of her imprisonment and rape at the hands of Sandinista officers.
 
 
 8
 The State Department's Bureau of Human Rights and Humanitarian Affairs ("BHRHA") issued an advisory opinion on October 24, 1989,[3] concluding Lopez-Galarza had a "well-founded fear of persecution in Nicaragua."[4] However, following the Sandinistas' defeat in the February 1990 presidential election and the election of a new coalition government supported by parties in opposition to the Sandinista Party, the immigration judge ("IJ") continued Lopez-Galarza's deportation hearing to await a second advisory opinion from the BHRHA. The BHRHA issued a second opinion on June 27, 1990, concluding that, in light of the Sandinistas' recent defeat, Lopez-Galarza no longer had a well-founded fear of persecution.
 
 
 9
 On September 10, 1990, the IJ denied Lopez-Galarza's application for asylum and withholding of deportation. The IJ expressed some skepticism about the details of her 1981 imprisonment,[5] but stated that "assuming arguendo" that the incident was politically motivated and Lopez-Galarza was treated as she alleged, the 1981 incident would constitute past persecution based on political opinion. It nevertheless concluded that the Sandinistas' defeat eliminated any well-founded fear of future persecution. The IJ granted voluntary departure under 8 U.S.C. § 1254(e).
 
 
 10
 On September 21, 1994, the BIA denied petitioner's request for oral argument, upheld the denial of asylum and withholding of deportation, and upheld the grant of voluntary departure. Lopez-Galarza timely petitioned for review of the BIA's final order.
 
 ANALYSIS
 
 11
 Lopez-Galarza raises two challenges to the BIA's denial of asylum. She argues that her imprisonment, rape, and other physical abuse by Sandinista military officials warrants a grant of asylum on the basis of past persecution alone, pursuant to Matter of Chen, Int. Dec. 3104 (BIA 1989). She also challenges the BIA's determination that she failed to establish a well-founded fear of future persecution in Nicaragua. In the alternative, Lopez-Galarza argues that she satisfied the requirements for withholding of deportation under 8 U.S.C. § 1253(h).
 
 1. Asylum under 8 U.S.C. § 1158(a)
 
 12
 a. Eligibility for Asylum
 
 
 13
 Where the BIA reviews the IJ's decision de novo, we are limited to reviewing the decision of the BIA. Acewicz v. INS, 984 F.2d 1056, 1059 (9th Cir.1993). We review for "substantial evidence" the BIA's determination of eligibility for asylum. Ramos-Vasquez v. INS, 57 F.3d 857, 861 (9th Cir.1995). This means that the BIA's eligibility determination "must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.' " Id. (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992)).
 
 
 14
 To be eligible for asylum, petitioner must show that she is unable or unwilling to return to her country because she has suffered past persecution or has a well-founded fear of future persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Once eligibility is established, it is within the Attorney General's discretion to grant asylum. INS v. Cardoza-Fonseca, 480 U.S. 421, 428 n. 5, 107 S.Ct. 1207, 1211 n. 5, 94 L.Ed.2d 434 (1987).
 
 
 15
 Past persecution and a well-founded fear of future persecution provide separate avenues for establishing eligibility for asylum. Kazlauskas v. INS, 46 F.3d 902, 905 (9th Cir.1995) (citing Acewicz, 984 F.2d at 1061-62 and Berroteran-Melendez v. INS, 955 F.2d 1251, 1255 (9th Cir.1992) (citing Desir v. Ilchert, 840 F.2d 723, 726 (9th Cir.1988))).
 
 
 16
 (i) Well-founded Fear of Future Persecution
 
 
 17
 A well-founded fear of future persecution has both subjective and objective components. Prasad v. INS, 47 F.3d 336, 338 (9th Cir.1995) (citation omitted). The subjective component may be satisfied by credible testimony that the applicant genuinely fears persecution. Id. (citing Acewicz, 984 F.2d at 1061). The objective component requires "a showing by credible, direct, and specific evidence of facts supporting a reasonable fear of persecution on the relevant ground." Prasad, 47 F.3d at 338 (citations omitted).
 
 
 18
 In considering whether Lopez-Galarza was eligible for asylum, the BIA first found no basis in the record to support a "well-founded fear of persecution," 8 U.S.C. § 1101(a)(42)(A). It based this conclusion in large part on the BHRHA's revised opinion, which reported that the Sandinistas no longer governed Nicaragua and that arrests of relatives of former Somoza National Guard members had ceased. The BIA concluded that the change in regimes in Nicaragua had reduced or eliminated the objective threat of future persecution.
 
 
 19
 Because we decide this case on the basis of past persecution, we need not reach factual questions that relate to the political climate of Nicaragua as it may impact the likelihood of future persecution.
 
 
 20
 (ii) Past Persecution
 
 
 21
 It is the well-settled law of this circuit that eligibility for asylum "may be based on past persecution alone," Acewicz, 984 F.2d at 1062, even absent a well-founded fear of future persecution. Desir v. Ilchert, 840 F.2d 723, 729 (9th Cir.1988). We have defined persecution as " 'the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive.' " Prasad, 47 F.3d at 339 (quoting Desir, 840 F.2d at 726-27).
 
 
 22
 We have long held that persecution may be established by detention coupled with physical torture. Prasad, 47 F.3d at 339 (citing Desir, 840 F.2d at 727). Although we have rarely encountered an application for asylum that is based on rape or sexual assault, we have held that such abuse may constitute persecution. Indeed, that was our conclusion in Lazo-Majano v. INS, 813 F.2d 1432 (9th Cir.1987), overruled on other grounds by Fisher v. INS, 79 F.3d 955 (9th Cir.1996) (en banc). In that case, the petitioner was a Salvadoran woman who occasionally worked as a maid for a Salvadoran military official. That official raped her on several occasions, and inflicted other physical abuse, including beatings. He denounced the petitioner and her husband as "subversives," and threatened to kill both of them if her husband, who had fled the country for political reasons, returned to El Salvador. Id. at 1433.
 
 On the facts of that case, we concluded:
 
 23
 Persecution is stamped on every page of this record. [The petitioner] has been singled out to be bullied, beaten, injured, raped, and enslaved. [Her] initial acquiescence [in working for the official] does not alter the persecutory character of her treatment.... The persecution has been conducted by a member of the Armed Force, a military power that exercises domination over much of El Salvador.... [The official] had his gun, his grenades, his bombs, his authority and his hold over [the petitioner] because he was a member of this powerful military group.
 
 Id. at 1434.[6]
 
 24
 Although rape can support a finding of persecution under 8 U.S.C. §§ 1101(a)(42)(A) & 1158(a), we note that a petitioner alleging persecution must present some evidence, direct or circumstantial, of the persecutor's motive, since 8 U.S.C. § 1101 requires "persecution on account of" various characteristics, such as political opinion. Canas-Segovia v. INS, 970 F.2d 599, 601 (9th Cir.1992) (citing INS v. Elias-Zacarias, 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)). Persecution on account of imputed political opinion, however, satisfies the motive requirement, whether or not that imputation is accurate. Canas-Segovia, 970 F.2d at 601-02.
 
 
 25
 In this case, several facts suggest that the rape and other abuse was "on account of" Lopez-Galarza's political opinion. Lopez-Galarza's neighbor, a woman who was staunchly pro-Sandinista and a member of the Sandinista military, accused Lopez-Galarza of being a contra supporter. Additionally, Sandinista military officials knew of Lopez-Galarza's father's ties to the Somoza regime. Members of the Sandinista military imprisoned Lopez-Galarza for these reasons. While Lopez-Galarza was in captivity, her captors raped her, physically abused her, deprived her of food, and subjected her to forced labor. The circumstances of her physical and mental abuse create a strong inference, unrebutted by contrary proof, that this abuse was premised on Lopez-Galarza's perceived political opposition to the Sandinista regime.
 
 
 26
 We reached a similar result in Lazo-Majano. There, the BIA had rejected the petitioner's application for asylum because it characterized the military official's rape and abuse as "strictly personal actions [which] do not constitute persecution within the meaning of the [statute]." Lazo-Majano, 813 F.2d at 1434. We rejected that contention, however, because the official responsible for the petitioner's torture had denounced her as a "subversive," id. at 1435, and we noted that "the cynical imputation of political opinion to [the petitioner] is what counts under [the statute]." Id.
 
 
 27
 In our view, Lopez-Galarza's rape and physical abuse at the hands of Sandinista military officers, coupled with her imprisonment, food deprivation, and forced labor, satisfies the definition of "persecution."[7] Although the nature of Lopez-Galarza's sexual assault was different than that endured by the petitioner in Lazo-Majano, many aspects of her experience were more severe. Unlike the petitioner in Lazo-Majano, Lopez-Galarza displayed no "initial acquiescence" toward her persecutors, but instead was forcibly removed from her home and imprisoned. Moreover, the evidence is even stronger in this case that Lopez-Galarza was singled out for her suspected political beliefs: Her family's ties to the Somoza regime were well-known in her community and she was denounced as a contra supporter by a different member of the Sandinista military. We therefore conclude that the past persecution Lopez-Galarza suffered makes her eligible for asylum.
 
 
 28
 The BIA agreed. It concluded that Lopez-Galarza's account of her ordeal "would appear to establish past persecution on account of political opinion or membership in a particular social group." (emphasis added) However, it ultimately exercised its discretion to deny the application for asylum. We next consider that exercise of discretion.
 
 
 29
 b. The Discretionary Denial of Asylum
 
 
 30
 We review for abuse of discretion the BIA's denial of asylum. Id. The BIA abuses its discretion if the decision is "arbitrary, irrational, or contrary to law." Padilla-Agustin v. INS, 21 F.3d 970, 973 (9th Cir.1994) (internal quotations and citations omitted).
 
 
 31
 " 'In determining whether to grant asylum as a discretionary matter, the likelihood of future persecution is a particularly important factor to consider.' " Rodriguez-Matamoros v. INS, 86 F.3d 158, 160-61 (9th Cir.1996) (quoting Kazlauskas, 46 F.3d at 906 (citation omitted)). But "[i]t is not the only factor, however. As the BIA held in Matter of Chen, humanitarian reasons may also influence the favorable exercise of discretion." Rodriguez-Matamoros, 86 F.3d at 161.
 
 
 32
 In Chen, the BIA explained that "there may be cases where the favorable exercise of discretion is warranted for humanitarian reasons even if there is little likelihood of future persecution." Chen, Int. Dec. 3104 at 3 (citations omitted). Accord Rodriguez-Matamoros, 86 F.3d at 161; Kazlauskas, 46 F.3d at 906-07; Acewicz, 984 F.2d at 1062. The BIA in Chen acknowledged that this principle was recognized by the Office of the United Nations High Commissioner for Refugees, which stated:
 
 
 33
 It is frequently recognized that a person who--or whose family--has suffered under atrocious forms of persecution should not be expected to repatriate. Even though there may have been a change of regime in [the petitioner's] country, this may not always produce a complete change in the attitude of the population, nor, in view of [the petitioner's] past experiences, in the mind of the refugee.
 
 
 34
 Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees (Geneva, 1979) (emphasis added).
 
 The BIA went on to explain that
 
 35
 [W]hile the likelihood of future persecution is a factor to consider in exercising discretion in cases where an asylum application is based on past persecution, asylum may in some situations be granted where there is little threat of future persecution. Moreover, as with any case involving the exercise of discretion, all other factors, both favorable and adverse, should also be considered[.]
 
 
 36
 Chen, Int. Dec. 3104 at 3 (citations omitted) (emphasis added).
 
 
 37
 We have interpreted this standard to require that "[a]bsent a likelihood of future persecution, asylum is warranted for humanitarian reasons only if [the petitioner] demonstrates that in the past, [he] or his family has suffered under atrocious forms of past persecution." Kazlauskas, 46 F.3d at 906 (internal quotations and citations omitted) (emphasis added).
 
 
 38
 In Chen, the petitioner's father, a Christian minister, was imprisoned, forbidden to practice his faith, dragged through the streets in humiliation, and tortured. The petitioner was locked in his house for six months, interrogated, kicked, and deprived of food and medical care. He was later sent to a rural village for "reeducation," where he was ostracized because of his father's religion. The petitioner testified that this past persecution rendered him "physically debilitated," and that he was "anxious and fearful" and would kill himself if forced to return to China.
 
 
 39
 The BIA granted asylum in that case based on the petitioner's and his family's past persecution during China's Cultural Revolution, despite concluding that the petitioner did not have a "well-founded fear of future persecution." In exercising its discretion to grant asylum, the BIA acknowledged that "conditions had changed," but noted that there still were occasional human rights abuses and little religious freedom, and the petitioner "still genuinely fear[ed] returning." Chen, Int. Dec. 3104 at 8.
 
 
 40
 In this case, despite its conclusion that Lopez-Galarza's account of her ordeal in captivity "appear[ed] to establish past persecution on account of political opinion or membership in a particular social group," and thus made her eligible for asylum, the BIA declined to exercise its discretion to grant asylum.
 
 
 41
 First, acknowledging that "[a] showing of past persecution [ ] establishes eligibility for asylum and also creates a rebuttable presumption of persecution in the future," the BIA nevertheless concluded that the government had rebutted the presumption of future persecution, stating:
 
 
 42
 [T]here exists from the record before us no likelihood of persecution in the future in view of the change of government in Nicaragua. In this regard, we point out that the respondent remained in Nicaragua for another 8 years. During that time, she worked as a food preparer at a government hospital, and suffered no harm other than harassment by Sandinista groups that would throw stones and write graffiti on the family home, and call her and other family members derogatory names.
 
 
 43
 Second, it stated that "[e]ven if past persecution had been established in the instant case, we would not conclude from our independent review of the record that there are humanitarian or compelling bases that presently warrant a grant of asylum."
 
 
 44
 The BIA's sole explanation[8] for finding no "humanitarian or compelling bases" for a favorable exercise of discretion was as follows:[W]e do not minimize the brutality of her treatment in prison, or the trauma resulting from her rape. In other circumstances, such past persecution could warrant a grant of asylum in the exercise of discretion. However, we do not find it inhumane in the circumstances of this case to require her to return to Nicaragua, where she continued to live in her native country for another 8 years after her mistreatment, during which time she worked for a government hospital, married, and had two children.
 
 
 45
 We begin by noting that the sole facts the BIA mentioned in finding deportation not "inhumane" were essentially the same facts it relied on in finding no likelihood of future persecution: e.g., the petitioner remained in Nicaragua for eight years, worked, married and had children. These facts simply are not relevant to the "atrocity" of her past persecution, however, since that persecution had already taken place, and remaining did not lessen its severity. Moreover, Lopez-Galarza did not remain voluntarily: Sandinista authorities prevented her departure by denying her a passport.
 
 
 46
 A more serious problem with the BIA's decision, however, is that the BIA simply failed to analyze whether Lopez-Galarza "ha[d] suffered under atrocious forms of past persecution." Kazlauskas, 46 F.3d at 906 (internal quotations and citations omitted). The BIA made no attempt to articulate why Lopez-Galarza's persecution was less "atrocious" than that of the petitioner in Chen. Departing from its rationale in Chen, the BIA therefore failed to consider "all other factors, both favorable and adverse." Chen, 3104 Int. Dec. at 3.
 
 
 47
 Rape at the hands of government authorities while imprisoned on account of one's political views can be an atrocious form of punishment indeed. The severity of the harm of rape is underscored by the numerous studies revealing the physical and psychological harms rape causes. A recent article in the Journal of the American Medical Association summarized several studies of the effects of rape, and concluded:
 
 
 48
 Rape commonly results in severe and long-lasting psychological sequelae that are complex and shaped by the particular social and cultural context in which the rape occurs.... Commonly reported feelings at the time of the rape include shock, a fear of injury or death that can be paralyzing, and a sense of profound loss of control over one's life. Longer-term effects can include persistent fears, avoidance of situations that trigger memories of the violation, profound feelings of shame, difficulty remembering events, intrusive thoughts of the abuse, decreased ability to respond to life generally, and difficulty reestablishing intimate relationships.
 
 
 49
 Shana Swiss & Joan E. Giller, "Rape as a crime of war: a medical perspective," J. Amer. Med. Ass'n., August 4, 1993.[9]
 
 
 50
 Other articles have described additional long-term psychological effects of rape,[10] including chronic anxiety, nightmares, catastrophic fantasies, feelings of alienation and isolation, sexual dysfunctions, physical distress, mistrust of others, phobias, depression, hostility, and suicidal thoughts. American Medical Association's Council on Scientific Affairs, "Violence against women: relevance for medical practitioners," J. Amer. Med. Ass'n., June 17, 1992.[11] The effects of rape appear to resemble the effects of torture. A recent article compared the psychological sequelae of rape survivors to the psychological distress endured by survivors of abuse constituting torture under international law, and concluded that "the suffering of rape survivors is strikingly similar in intensity and duration to the suffering endured by torture survivors." Note, "Torture by Means of Rape," 84 Georgetown L.J. 1913, 1931 (1996).
 
 
 51
 Finally, we note that the Immigration and Naturalization Service ("INS") recently took official action to recognize rape and sexual abuse as a form of persecution. In May 1995, the INS promulgated guidelines for asylum adjudications that recognize sexual abuse and rape as potential forms of persecution. INS, Considerations for Asylum Officers Adjudicating Asylum Claims from Women (1995) ("INS Guidelines"). These guidelines direct immigration officers to recognize that female applicants may face unique "gender persecution," which includes rape and sexual abuse, and provides that "rape and other forms of severe sexual violence" are examples of physical harm that constitutes persecution. INS Guidelines at 9 (citing Lazo-Majano, 813 F.2d at 1434).
 
 
 52
 In exercising its discretion to deny asylum in this case, the BIA simply failed to consider the level of atrocity of past persecution as the law of this Circuit and the BIA's own precedent requires. See Kazlauskas, 46 F.3d at 906; Chen, 3104 Int. Dec. at 3. Chen is not an inflexible standard, and we have not attempted to define "the minimum showing of 'atrocity' necessary to warrant a discretionary grant of asylum based on past persecution alone." Kazlauskas, 46 F.3d at 907. In this regard, we are not the first to note that the BIA should consider whether a petitioner's experience is of "comparable severity." See Kahssai v. INS, 16 F.3d 323, 329 (9th Cir.1994) (Reinhardt, J. concurring). This the BIA did not do. We note that "[a]t a minimum, the BIA must provide an explanation 'sufficient to enable us as a reviewing court to see that the Board has heard, considered, and decided.' " Rodriguez-Matamoros, 86 F.3d at 161 (citing Villanueva-Franco v. INS, 802 F.2d 327, 330 (9th Cir.1986)). Because the BIA deviated from the law of this Circuit as well as from its own precedent, its decision was "contrary to law" and therefore an abuse of decision. Padilla-Agustin, 21 F.3d at 973 (internal quotations and citations omitted).
 
 
 53
 2. Withholding of Deportation under 8 U.S.C. § 1253(h)
 
 
 54
 Because we grant the petition for review under 8 U.S.C. § 1158(a), we need not reach the petitioner's claim that the BIA abused its discretion in refusing to withhold deportation under 8 U.S.C. § 1253(h).
 
 CONCLUSION
 
 55
 We reverse the BIA's order and remand the case for the BIA to proceed in a manner consistent with this opinion, including holding oral argument in this matter.
 
 
 56
 PETITION GRANTED.
 
 BEEZER, Circuit Judge, concurring:
 
 57
 The BIA failed to adequately consider Lopez-Galarza's claim of past persecution at the hands of Sandinista authorities. Kazlauskas v. INS, 46 F.3d 902, 906 (9th Cir.1995). I concur in the judgment of the court.
 
 
 
 *
 The panel finds this case appropriate for submission without argument pursuant to Fed. R.App. P. 34(a) and Ninth Circuit Rule 34-4
 
 
 **
 Honorable Thomas Zilly, United States District Judge for the Western District of Washington, sitting by designation
 
 
 [1]
 They have applied for asylum
 
 
 [2]
 She has applied for asylum
 
 
 [3]
 The State Department issued an advisory opinion pursuant to 8 C.F.R. § 236.3(b)
 
 
 [4]
 Based on a virtually identical advisory opinion, Lopez-Galarza's mother, Socorro Galarza-Zuniga, was granted asylum on March 10, 1990
 
 
 [5]
 The IJ's skepticism stemmed from factors that are unsupported by the record or are legally erroneous. First, Lopez-Galarza was unable to obtain an official record of her imprisonment. Second, the IJ noted minor discrepancies between Lopez-Galarza's testimony and that of her half-sister: Lopez-Galarza testified that she was abducted by military officials, while her half-sister testified that the abductors were dressed in civilian clothes; Lopez-Galarza testified that she was held at a police station, whereas her half-sister testified that she was held at a house being used as a police station. These discrepancies appear insignificant. Third, the IJ surmised that the problems between Lopez-Galarza and her neighbor might have been merely personal, but his speculation was squarely refuted by the half-sister's testimony. Fourth, the IJ concluded that "had [Lopez-Galarza] participated as required" in the CDS, she would not have encountered the troubles she did. This conclusion is legally impermissible, since choosing neutrality is a political decision that may be the basis for persecution. Bolanos-Hernandez v. INS, 767 F.2d 1277, 1286 (9th Cir.1984)
 
 
 [6]
 In Lazo-Majano, we held that the petitioner faced a "clear probability of persecution" and therefore was entitled to withholding of deportation under 8 U.S.C. § 1253(h). Id. at 1435
 
 
 [7]
 Because the BIA did not doubt Lopez-Galarza's testimony, it "must be assumed that [the BIA] found her testimony credible." Lazo-Majano, 813 F.2d at 1434
 
 
 [8]
 We note that in addition to this explanation, the BIA did include a string of citations to decisions in which various circuit courts have affirmed the BIA's refusal to grant asylum on the basis of "atrocious" past persecution
 The cases cited by the BIA, however, bear little factual resemblance to this case, and therefore do not support the BIA's conclusion. Cf. Tokarska v. INS, 978 F.2d 1, 2 (1st Cir.1992) (petitioner, supporter of Poland's Solidarity movement, was struck in head with tear-gas canister during demonstration, arrested and questioned, had desk at work searched, and received no job promotion or pay raise); Baka v. INS, 963 F.2d 1376, 1379 (10th Cir.1992) (petitioners harassed by fellow workers because they were Catholic and did not belong to the Communist Party, and held less advantageous jobs than members of the Communist Party); Gutierrez-Rogue v. INS, 954 F.2d 769, 771 (D.C.Cir.1992) (petitioner, teacher, agreed to teach Marxism for a year in Cuba to secure her husband's release from jail by Sandinista officials, had ration card confiscated, and received death threat from civilian gang supported by government militia); Skalak v. INS, 944 F.2d 364, 365 (7th Cir.1991) (petitioner jailed twice for interrogation and harassed by officials at her job); Rojas v. INS, 937 F.2d 186, 188 (5th Cir.1991) (petitioner arrested and beaten for refusal to join military, and later fired from job and denied other employment).
 
 
 [9]
 The article cites A.W. Burgess & L.L. Holstrom, "Rape trauma syndrome," Am. J. Psychiatry, 131:981-86 (1974); J.M. Santiago, F. McCall-Perez, M. Gorcey, & A. Beigel, "Long-term psychological effects of rape in 35 rape victims," Am. J. Psychiatry, 142:1338-1340 (1985); E.M. Ellis, B.M. Atkeson, & A.S. Calhoun, "An assessment of long-term reactions to rape," J. Abnorm. Psychol., 90: 263-66 (1981); J.V. Becker, L.J. Skinner, G.G. Abel, R. Axelrod, J. Cichon, "Sexual problems of sexual assault survivors," Women's Health, 9:5-19 (1984); J.V. Becker, L.J. Skinner, G.G. Abel, L.C. Treacy, "Incidence and types of sexual dysfunctions in rape and incest victims," J. Sex. Marital Ther., 8:65-74 (1982); E.M. Ellis, K.S. Calhoun, B.M. Atkeson, "Sexual dysfunction in victims of rape," Women's Health, 5:39-47 (1980)
 
 
 [10]
 The effects of rape appear to endure for months or even years. One study found that thirty-seven per cent of survivors felt they had recovered within several months of the assault, while another thirty-seven per cent felt they had recovered only after several years, and the remaining twenty-six per cent felt that they had not yet recovered four to six years after their rapes. Ann W. Burgess & Lynda L. Holmstrom, "Adaptive Strategies and Recovery from Rape," 136 Am. J. Psychiatry 1278, 1278-81 (1979)
 
 
 [11]
 See also Harvard Women's Health Watch, "Posttraumatic Stress" (August 1, 1995) (discussing the effects of rape as a form of posttraumatic stress disorder in women)