# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-3645

VIOLLCA BRUCAJ,

*Petitioner-Appellant,*

v.

JOHN D. ASHCROFT,

*Respondent-Appellee.*

_____

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A77-645-001

_____

ARGUED JUNE 7, 2004—DECIDED AUGUST 20, 2004

_____

Before POSNER, RIPPLE and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Petitioner Viollca Brucaj seeks review of an adverse decision of the Board of Immigration Appeals (the "BIA" or "Board") that denied her request for asylum. For the reasons set forth in the following opinion, we grant the petition, reverse the decision of the BIA and remand for further proceedings consistent with this opinion.

## I
## BACKGROUND

### A. Facts

Ms. Brucaj is an ethnic Albanian, a native of Kosovo and a citizen of the Federal Republic of Yugoslavia (Serbia-

Montenegro).[1] She was born in Kline, Kosovo, where she lived until April 1999. Ms. Brucaj resided with her parents and two older brothers.

On April 9, 1999, Serbian soldiers under the general leadership of Slobodan Milosevic came to Ms. Brucaj's village and killed a number of people, including her cousins. Ms. Brucaj watched the onslaught from a window in her home; however, she and her family could not leave because Serbian soldiers had surrounded her village.

The next day, Serbian solders arrived at Ms. Brucaj's home. The soldiers accused Ms. Brucaj's father of storing illegal weapons. They handcuffed Ms. Brucaj's mother and father. Then, with her parents present, the soldiers brutally gang-raped Ms. Brucaj and beat her with their fists and the butts of their weapons. Ms. Brucaj's father also was beaten in the same manner.

The soldiers demanded to know where Ms. Brucaj's brother, Pjerin, was living. Ms. Brucaj told them that Pjerin lived in Detroit, Michigan. The soldiers stated that they wanted Pjerin back in Kosovo so they could kill him. Ms. Brucaj testified that she believed the soldiers had targeted her family because her father was a member of the Democratic Party of Kosovo.[2]

At some point during this ordeal, Ms. Brucaj lost consciousness. When she regained consciousness, she found that the soldiers had left her on a roadside in Albania. The Noklaj family found her and took her to their home in Albania where she stayed for several months. While she was

---

[1]  Kosovo is a province in Serbia, which is part of the Federal Republic of Yugoslavia (Serbia-Montenegro).

[2]  Ms. Brucaj was twenty-one at the time of these events.

there, she made contact with her brother Pjerin. Over time, Pjerin sent her money, and Ms. Brucaj eventually was able to buy a United States passport for $5,000. In October of 1999, Ms. Brucaj fled to the United States. Upon her arrival at Chicago's O'Hare Airport, Ms. Brucaj was detained by immigration officials.

Ms. Brucaj has not heard from her parents since the ordeal in April of 1999. She stated that her brother, Ardjian, joined the Kosovo Liberation Army in early 1999 and that he was taken by a group of soldiers warring against Albanians; Ms. Brucaj does not know if he is alive. Pjerin, who still resides in Detroit, testified that he has attempted to find their parents through the Red Cross and the internet but has been unable to locate them. Pjerin also stated that he had spoken by cell phone with their other brother, Ardjian, approximately one year prior to Ms. Brucaj's asylum hearing; however, Pjerin had not heard from Ardjian since that time.

### B. Administrative Proceedings

Shortly after her arrival in the United States, the Immigration and Naturalization Service instituted removal proceedings against Ms. Brucaj. At her initial hearing, Ms. Brucaj conceded that she was an alien who had sought to procure entry to the United States by fraud or willful misrepresentation of fact, and she sought asylum, withholding of removal and relief under the Convention Against Torture ("CAT").

Both Ms. Brucaj and Pjerin testified at her asylum hearing to the events set forth above. Additionally, the Government submitted the 2000 State Department Country Report on Human Rights Practices in Yugoslavia. This report noted that "[v]irtually no town or settlement escaped the effects of the Milosevic regime's campaign of ethnic cleansing in 1999,

with reports of dozens, sometimes hundreds, of civilians murdered in each town." A.R. 230. It also explained that, beginning in June of 1999, after the NATO campaign that forced the withdrawal of Yugoslav and Serbian forces, the United Nations Interim Administrative Mission in Kosovo ("UNMIK") began to establish civil authority over Kosovo. *See* A.R. 226. Kosovo has been governed separately from Serbia-Montenegro since that time. The report noted that "UNMIK generally adhered to international human rights standards in its administration of the province; however, serious problems remained, largely as a result of inter-ethnic tensions." A.R. 228. The report also recounted that, in October of 1999, elections in Kosovo were conducted and were considered a general success, although Serbs did not participate. *See* A.R. 227. Furthermore, the report stated that over "150,000 Kosovar Albanians returned to the province during the year; only a few ethnic Serbs and other minorities returned." A.R. 228. According to the report, it appears that much of the violence in Kosovo is now directed at Serbs. *See* A.R. 228.

On the merits, the IJ denied Ms. Brucaj's asylum claim. The IJ never made an explicit credibility determination; however, the IJ appeared to believe Ms. Brucaj's testimony regarding the events of April 1999 because the IJ found that these events established past persecution. *See* A.R. 37. "[H]owever," he concluded, "the presumption of a well-founded fear of future persecution [wa]s rebutted by changed country conditions." *Id.* The IJ explained:

> The respondent and her family suffered harm from the platforms set forth by former leader, Milosevic. Milosevic has been removed from power [and] is currently being prosecuted for the war crimes he committed and supported during his tenure. The Federal Republic of

> Yugoslavia has been recognized by the international community and has a new president. *See* 2000 Country Report at page 2.

*Id.* The IJ then noted: "The respondent has failed to establish her eligibility for asylum; accordingly, she also fails to meet the more stringent standard of clear probability of persecution required for relief in the form of withholding of removal." *Id.* at 37-38. Although Ms. Brucaj had argued that she should be granted asylum on humanitarian grounds as well, the IJ did not discuss this basis for relief in his opinion.[3]

Ms. Brucaj appealed the IJ's decision to the BIA. On September 9, 2003, a single member of the Board issued a per curiam order that affirmed the IJ's decision. The BIA first noted that, although Ms. Brucaj had suffered past persecution, it agreed with the IJ that the changed country conditions rebutted the presumption of future persecution.

Unlike the IJ, the BIA also considered Ms. Brucaj's claim that she was entitled to humanitarian asylum based on the past persecution alone. *See* 8 C.F.R. § 1208.13(b)(1)(iii)(A). The BIA reasoned that "[a]lthough the respondent suffered harm amounting to persecution, she has failed to present

---

[3] The IJ also considered and rejected Ms. Brucaj's claim for relief based on the CAT. The IJ apparently found that it was not more likely than not that Ms. Brucaj would be tortured if she were removed. Again, the IJ relied on the fact that a different regime is now in power. He also noted that "[t]here have been recent outbreaks of some violence" under the new regime, "but it was not through government action or acquiescence." A.R. 39; *see also* 8 C.F.R. § 208.18(a)(1) (explaining that the torture must be "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity").

any evidence to support her assertion that she would suffer severe psychological harm if she were to return to Yugoslavia." A.R. 2.[4]

# II

## ANALYSIS

### A.  Standard of Review

In cases such as this, where "the board's opinion merely supplements the immigration judge's opinion, the latter opinion as supplemented by the board's opinion becomes the basis for review." *Niam v. Ashcroft*, 354 F.3d 652, 655-56 (7th Cir. 2004). We review the asylum determination under the substantial evidence test: The decision may be overturned only if the record compels a contrary result. *Georgis v. Ashcroft*, 328 F.3d 962, 967-68 (7th Cir. 2003).

### B.  Asylum Based upon Past Persecution

In order to be eligible for asylum, Ms. Brucaj must establish that she is a refugee within the meaning of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42). One means of meeting this burden is to come forward with evidence of past persecution. *See, e.g.*, *Begzatowski v. INS*, 278 F.3d 665, 669 (7th Cir. 2002). If Ms. Brucaj establishes past

---

[4]  The Board also held that Ms. Brucaj had failed to establish eligibility for asylum as a member of a particular social group: "Moreover, we find that respondent failed to put forth evidence that she would face a reasonable possibility or a clear probability of being kidnapped and trafficked for prostitution as a member of a particular social group if she were now to return to her country." A.R. 2.

persecution, she is entitled to a rebuttable presumption that she has a well-founded fear of future persecution and therefore should be granted asylum. *See Ambati v. Reno*, 233 F.3d 1054, 1069-70 (7th Cir. 2000). The Government may rebut this presumption if it establishes, by a preponderance of the evidence, that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality . . . ." 8 C.F.R. § 1208.13(b)(1)(i)(A).

In this case, both the IJ and the BIA found that Ms. Brucaj suffered past persecution, and she is therefore entitled to the presumption that she will suffer future persecution. However, the IJ also found that the Government had rebutted the presumption by establishing that there had been a "fundamental change" in regime. The IJ reasoned that Ms. Brucaj's past persecution was part of the ethnic cleansing of Albanians in Kosovo orchestrated by the regime of Milosevic. Furthermore, because Milosevic had been removed from office and a new government had been installed, Ms. Brucaj was not likely to suffer future persecution as a result of her Albanian ethnicity.

We believe that the IJ's conclusion is supported by substantial evidence. The 2000 Country Report discusses the dismantling of Milosevic's regime in Yugoslavia and, as set forth above, the establishment of a new government in the Kosovo province. The report indicates there is still inter-ethnic violence; however, much of that violence now is directed at the Serbs. Regarding Kosovo, the report specifically states that "[a]lthough there was credible evidence of Yugoslav agents and special forces teams in Kosovo, there were no

confirmed reports of killings by Yugoslav or official Serbian forces inside the province." A.R. 230.[5]

Ms. Brucaj does not argue that the evidence of record fails to support the IJ's and the BIA's decision. Instead, she suggests that the BIA, in adjudicating her appeal, should have considered changes that have occurred in the region *since* the Country Report was issued and *since* the time of the IJ's decision. *See* Reply Br. at 4. Ms. Brucaj identifies two intervening events that, she believes, should have been considered by the BIA:

> First, in June 2003, hard-line Serb nationalists, who support Milosevic, regained control in the former Yugoslavia, Brucaj's country of feared persecution. *See* BBC News, *Timeline: After Milosevic A Chronology of Key Events*, December 29, 2003. Second, an issue which partly underpins the IJ's decision denying Ms. Brucaj asylum, in March 2003, Serbian Prime Minister Zoran Djindjic was assassinated.

Petitioner's Br. at 14-15.

The Government suggests that the BIA was justified in issuing its opinion without reference to the events raised by Ms. Brucaj because these events have not precipitated a change in the treatment of Albanians in Kosovo, nor is such a change likely. The Government notes that since the middle of 1999, Kosovo has been under the civil authority of the

---

[5] The only actions set forth in the report that bear *any* resemblance to the actions that took place under Milosevic are some continued efforts by Kosovar Serbs to expel Albanians from the northern section of the city of Mitrovica; there were no similar efforts reported with respect to any other areas including Ms. Brucaj's hometown of Kline. *See* A.R. 230.

UNMIK, under United Nations Security Counsel Resolution 1244, and thus has remained apart from the government of Serbia-Montenegro generally and Serbia specifically. *See* A.R. 226 (2000 Country Report); Department of State Country Report on Human Rights Practices for Serbia and Montenegro (2003). "Thus," the Government states, "Kosovo remains under the same administration as it did in 2002, when the [IJ] decided this case." Respondent's Br. at 30.

In the typical asylum case, the burden is on the asylum applicant to submit evidence of changed country conditions to the BIA by way of a motion to reopen. *See Meghani v. INS*, 236 F.3d 843, 848 (7th Cir. 2001). We generally have not required the BIA "to *sua sponte* take administrative notice of the most recent country report" in rendering its decision. *Id.* We do not believe that Ms. Brucaj has presented to us the type of evidence that suggests some other course of action is appropriate here. The only authority Ms. Brucaj cites in her brief to this court—"BBC News, *Timeline: After Milosevic A Chronology of Key Events*, December 29, 2003"—does not clearly support her assertion that "in June 2003, hard-line Serb nationalists, who support Milosevic, regained control in the former Yugoslavia." Perhaps more importantly, this "Timeline" does not suggest that either the regaining of control by "hard-line Serb nationalists" or the assassination of Prime Minister Djindjic has caused a wave of violence against ethnic Albanians in Yugoslavia generally, in Serbia (where Kosovo is located) or in Kosovo itself. Finally, Ms. Brucaj does not explain how these events might impact Kosovo at all—an area still governed by UNMIK, under the auspices of the United Nations. Because the authority cited by Ms. Brucaj does not undermine, in any way, the determination of the IJ and the BIA that country conditions have improved such that Ms. Brucaj is unlikely to suffer future

persecution in Kosovo, we shall not disturb that portion of the IJ's or BIA's decision.

## C. Humanitarian Asylum

Even if the Government rebuts the presumption of future persecution with evidence of a change in regime, the Attorney General has the authority to grant asylum "as a matter of discretion for humanitarian reasons if the alien has suffered an 'atrocious form[] of persecution' . . . ." *Asani v. INS*, 154 F.3d 719, 722 (7th Cir. 1998) (quoting *Matter of Chen*, 20 I. & N. Dec. 16, 18 (BIA 1989)). Humanitarian asylum has its roots in *Matter of Chen*, 20 I. & N. Dec. 16. In *Chen*, the BIA determined that, even if the presumption of future persecution arising from past persecution has been rebutted, an alien may have suffered such severe or atrocious forms of persecution at the hands of the former regime such that it would be inhumane to require the alien to return to his home country. The BIA explained:

> [T]here may be cases where the favorable exercise of discretion is warranted for humanitarian reasons even if there is little likelihood of future persecution. That victims of past persecution should in some cases be treated as refugees or asylees even when the likelihood of future persecution may not be great has been recognized by the Office of the United Nations High Commissioner for Refugees, in The Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees (Geneva, 1988). There, referring to a "general humanitarian principle," it is written:
>
> > It is frequently recognized that a person who—or whose family—has suffered under atrocious forms of pers-

> ecution should not be expected to repatriate. Even though there may have been a change of regime in his country, this may not always produce a complete change in the attitude of the population, nor, in view of his past experiences, in the mind of the refugee.

*Id.* at § 136.

*Matter of Chen*, 20 I. & N. Dec. at 19.

This category of asylum is now codified at 8 C.F.R. § 1208.13(b)(1)(iii), which provides that an applicant still may gain asylum if she "has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution." 8 C.F.R. § 1208.13(b)(1)(iii)(A). We have explained that, "[t]o establish such eligibility, an alien must show past persecution so severe that repatriation would be inhumane." *Asani*, 154 F.3d at 724. The BIA has interpreted this form of relief to require an applicant first to show "severe harm" and "long-lasting effects." *Matter of N-M-A*, 22 I. & N. Dec. 312, 326 (BIA 1998). If this burden is met, then the IJ or BIA is to consider "a variety of discretionary factors, independent of the circumstances that led to the applicant's refugee status, such as his age, health, or family ties, which are relevant to the ultimate exercise of discretion." *Id.* at 325 n.7.

Ms. Brucaj "does not challenge the Board's authority to deny her asylum in the exercise of [its] discretion, even for humanitarian reasons." Petitioner's Br. at 16. Rather, she argues that the BIA's stated justification for denying her humanitarian asylum was insufficient. Ms. Brucaj claims that the Board's statement "fell terribly short of the rational explanation to which a litigant is entitled" and that the BIA failed to explain "why . . . [her] specific circumstances were not compelling enough for a grant of asylum for humanitarian reasons." *Id.* at 19. The burden is on Ms. Brucaj "to convince

us that the BIA gave short shrift to the evidence [she] presented." *Kaczmarczyk v. INS*, 933 F.2d 588, 595 (7th Cir. 1991).

The Government explains the BIA decision as holding that, "although Ms. Brucaj had testified that she still had memories of her persecution, she presented no objective evidence regarding the psychological harm that she claimed she would face if she were returned to Yugoslavia." Respondent's Br. at 32. The Board, therefore, "reasonably found that Ms. Brucaj did not make the required threshold showing" of lasting psychological harm. Accordingly, the BIA did not have to "reach the question of whether other humanitarian factors, such as family ties, would warrant the general exercise of discretion to grant asylum if the threshold showing had been made." *Id.* at 32-33.

There is no question that the BIA addressed Ms. Brucaj's claim to asylum on humanitarian grounds in cursory fashion; it stated: "[A]lthough the respondent suffered harm amounting to persecution, she has failed to present any evidence to support her assertion that she would suffer severe psychological harm if she were to return to Yugoslavia." A.R. 2. Indeed, not only is the BIA's one-line decision overly succinct, but it also does little more than paraphrase the language of the applicable regulation. Furthermore, the Board's statement is not rendered more clear or complete by reference to, or incorporation of, thorough analysis by an IJ.[6] *Cf. Man v. INS*, 69 F.3d 835, 838 (7th Cir. 1995) (finding a brief decision of the BIA did not evidence lack of consideration of petitioner's situation when BIA decision incorporated findings of IJ).

---

[6] As noted above, the IJ did not even consider the possibility of humanitarian relief.

This court has made clear that the BIA must "consider the issue of humanitarian aid raised and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought, not merely reacted." *Vergara-Molina v. INS*, 956 F.2d 682, 685 (7th Cir. 1992). Under the circumstances, we must conclude that the BIA's decision did not address the issues with the requisite degree of clarity necessary to conduct our review.

The BIA's statement rejecting Ms. Brucaj's humanitarian asylum claim is susceptible to several interpretations. For example, the Government suggests that the BIA rejected Ms. Brucaj's humanitarian asylum claim because she failed to produce some type of objective medical or psychological evidence to substantiate the lingering effects of the brutality she experienced in April 1999. *See* Respondent's Br. at 32 (explaining that the BIA's opinion relies on the fact she "presented no *objective* evidence regarding the psychological harm that she claimed she would face if she were returned to Yugoslavia" (emphasis added)). At oral argument, counsel for the Government suggested that the "objective evidence" requirement is grounded in BIA case law, specifically *Matter of N-M-A*, 22 I. & N. 312. Although *Matter of N-M-A* considered many aspects of humanitarian asylum, including the order of proof and the factors that contribute to a humanitarian asylum decision, it did not set forth specific types of evidence necessary to substantiate a humanitarian asylum claim. *See id.* at 324-26. Additionally, there is nothing in the regulations to suggest that only certain types of evidence can be used to demonstrate an asylum applicant's "compelling reasons for being unwilling or unable" to return to her country of origin. 8 C.F.R. § 1208.13(b)(1)(iii)(A). To the contrary, § 1208.13(a) strongly suggests that "objective" or expert evidence is not necessary. With respect to the initial burden of establishing asylum eligibility, the regulation

states, in relevant part: "The burden of proof is on the applicant for asylum to establish that he is a refugee . . . . The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.13(a). In short, there does not appear to be any basis in the BIA's own precedent or in the regulations for requiring "objective" or "expert" testimony to establish a humanitarian asylum claim.

Alternatively, the BIA simply may have meant that the brutal rape, beating and abandonment experienced by Ms. Brucaj was not "atrocious" enough to warrant a grant of humanitarian asylum. If this view is the basis for the Board's denial of relief to Ms. Brucaj, further explanation by the BIA regarding how Ms. Brucaj's experiences differ materially from other cases in which humanitarian relief has been granted is necessary. This is especially true given that the "severe and long-lasting" effects of rape are well-documented and are similar to those experienced by torture victims. *See Lopez-Galarza v. INS*, 99 F.3d 954, 962-64 (9th Cir. 1996) (discussing effects of rape based on psychological studies).

There is at least one other possible interpretation of the Board's statement rejecting Ms. Brucaj's claim. The BIA may have meant that it simply was not convinced that, based on Ms. Brucaj's testimony, she would suffer psychological harm if she was returned to Yugoslavia. We certainly hesitate to attribute such a crabbed appreciation of the brutality suffered by Ms. Brucaj to the Board. In her testimony, Ms. Brucaj spoke indirectly to this issue. She stated: "I always think about [those events]. I never forget about what happened to me. Even if I go to paradise, I will always think about them." A.R. 113. She also stated that she feels her "life is safer here with my brother." *Id.* At a minimum, we hope that the judges would not make such a crucial judgment based solely on the inability of the petitioner to articulate any more dramatically

such a personal and traumatic injury. Again, therefore, if this is the basis for the BIA's decision, some elaboration as to why Ms. Brucaj's testimony fell short of her burden would be helpful in conducting our review. We are concerned particularly about the absence of any thoughtful consideration of the impact of her return to the country of her persecution without the support of family members, loved ones whose absence is attributable to the same persecution that was visited upon her.

In sum, the precise basis for the BIA's decision cannot be gleaned from the single-sentence explanation included in the Board's order. As set forth above, it may be that the BIA was exercising its discretion within its statutory and regulatory authority when it denied Ms. Brucaj's claim. It appears, however, that in considering Ms. Brucaj's claim, it erected artificial barriers to relief that are not grounded in statute, regulation or case law. At a minimum, a more plenary consideration is certainly appropriate. We therefore grant Ms. Brucaj's petition and remand the case to the BIA for clarification regarding the basis for denying Ms. Brucaj's humanitarian asylum claim.[7]

---

[7] Although raised in her administrative proceedings, Ms. Brucaj did not make any argument in her opening brief regarding her CAT claim. Thus, she has waived that claim. *See Wedderburn v. INS*, 215 F.3d 795, 799 (7th Cir. 2000). Ms. Brucaj also argued in her administrative proceedings that she had a well-founded fear of future persecution based on her membership in a particular social group: young single women in the province of Kosovo and/or Albania. *See* A.R. 14-15. However, again, she failed to make any argument with respect to this claim before this court and, therefore, has waived that claim. *See Wedderburn*, 215 F.3d at 799.

### Conclusion

For the foregoing reasons, the petition for review is granted, the judgment of the BIA is reversed, and this case is remanded for further proceedings.

PETITION FOR REVIEW GRANTED;

REVERSED AND REMANDED

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*