NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 7, 2007
Decided March 13, 2008

**Before**

WILLIAM J. BAUER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 07-1030

| | |
|---|---|
| YOUSEF AL-NAJI, <br> *Petitioner*, | Petition for Review of an Order of the <br> Board of Immigration Appeals. |
| *v.* | No. A78-857-031 |
| MICHAEL B. MUKASEY,[*] Attorney <br> General of the United States, <br> *Respondent*. | |

**O R D E R**

   An immigration judge (IJ) denied petitioner Yousef al-Naji's request for withholding of removal, *see* 8 U.S.C. § 1231(b)(3)(A), a decision that the Board of Immigration Appeals (BIA) upheld. Al-Naji petitions us to review the IJ's and BIA's decisions. We deny the petition.

---

   [*] Pursuant to Fed. R. App. P. 43(c), Michael Mukasey is substituted for his predecessor, Alberto Gonzales, as the named respondent.

### I. HISTORY

Agents with the former Immigration and Naturalization Service arrested al-Naji, a Jordanian national, in 2002 after determining that he was in the United States illegally. Al-Naji confirmed that fact to the agents while detained; he admitted that he entered the United States in November 1999 on a non-immigrant visa and overstayed. Based on this admission, removal proceedings against al-Naji commenced. *See* 8 U.S.C. § 1227(a)(1)(B). After al-Naji unsuccessfully challenged the legality of his arrest and the admissibility of his post-arrest statements he filed an untimely asylum petition, claiming that while in Jordan he suffered harm because of his political opinion, and that, were he to return, the persecution would persist. *See* 8 U.S.C. § 1158(a)(1), (2)(A)-(B). Al-Naji alternatively sought protection under the Convention Against Torture (CAT), withholding of removal, and the chance to voluntarily depart. At the hearing on his requests for relief, al-Naji expounded on his claim of political persecution:

Al-Naji recounted that, from 1993 to 1996, he worked as a plant manager in a factory associated with the Queen Alia Fund for Social Development ("the Fund"), a government-run charitable organization established by the Jordanian royal family and named after the third wife of King Hussein of Jordan, Queen Alia al Hussein. While at the Fund he discovered that numerous factory employees were embezzling money. When al-Naji confronted the Fund's financial manager about the fraud, the manager offered him a bribe to remain quiet. When Al-Naji refused, the financial manager threatened to implicate him in the scheme if he said anything. Undeterred, al-Naji personally informed Queen Alia about the scheme when she visited the factory, an act that, in turn, led to an official investigation into the matter and resulted in several "senior officers" being fired.[1] The official pressure brought on by the investigation angered the financial manager and led him to demand that al-Naji resign or face jail. When al-Naji refused, the manager threatened to falsely accuse him of defaming the Queen—a crime that, al-Naji was told, "is punishable by slow death through constant physical torture" during imprisonment.

Al-Naji continued that twelve days later he was "forced" to resign from the Fund "on the Queen's orders," leaving him unemployed and unable to collect his retirement pension for his 17 years of government service. Upon his departure, the Fund's executive director provided al-Naji with a letter of recommendation to help him find another government job.

---

[1] It is here that we note that Queen Alia died in a highly publicized helicopter crash 20 years before al-Naji could have spoken to her. *See* Alia al-Hussein, http://en.wikipedia.org/wiki/Alia_al_Hussein (last visited Mar. 12, 2008). The Queen throughout the time that al-Naji worked at the Fund was King Hussein's fourth wife, Queen Noor of Jordan. *See* Queen Noor of Jordan, http://en.wikipedia.org/wiki/Queen_Noor_of_Jordan (last visited Mar. 12, 2008).

But because he could find no other readily available job, he ceased looking and opened his own ceramics factory after successfully obtaining the appropriate government licenses. While working at the factory, however, al-Naji endured unspecified "harassment" from the Fund's "marketing department." Al-Naji thus applied for visas to visit the United States, Brunei, and Germany so he could leave Jordan, "find a permanent job," and "establish a business" free from government harassment.

Al-Naji further claimed that, in 1997, Jordanian police delivered him a summons to appear in court. The summons did not identify the subject matter, but al-Naji believed that it was related to legal troubles involving his ceramics factory and not the Fund corruption. Al-Naji ignored the summons, and for two years he had no contact with Jordanian authorities. Then, in 1999, Jordanian police delivered a second summons that informed al-Naji that the "State's Attorney" had filed against him a "suit of public right," and that he was required to appear in the Jordanian "federal court" when his case was called. Al-Naji believed that this summons, unlike the first, stemmed from the Fund embezzlement scheme. This frightened al-Naji, who previously worked as a Jordanian policeman in the early 1980s and personally witnessed the arbitrary detention and torture of people summoned by the police. He accordingly feared that he, too, would be detained and tortured if he obeyed the summons. Al-Naji thus ignored the second summons, as he had the first, and prepared to depart for Brunei, having secured a visa from that country two weeks earlier. But when he obtained an American visa shortly thereafter and a subsequent job offer from a ceramics factory in Texas, he instead left for the United States in November 1999; al-Naji's wife and daughter joined him once they obtained tourist visas.

Al-Naji further testified that his brother Mohalmed, who lived in Jordan and worked in the government's "department of development," contacted him in early 2000. Mohalmed told al-Naji that Jordanian police came to Mohalmed's home with a third summons for al-Naji; Mohalmed, though, did not say what the summons concerned. Mohalmed also told al-Naji that the police departed without comment after they learned that al-Naji had left the country.

The third summons, al-Naji continued, spurred him to seek relief directly from King Abdullah II of Jordan. Specifically, he composed a letter asking the King (1) to contact him at his Chicago address; (2) to provide the reasons for his forced resignation from the Fund; and (3) to restore his retirement pension. Al-Naji closed the letter by stating that, if he received no response, he would publish the letter "in all the Arabic [n]ewspapers in the US." But despite receiving no response from the King or any other government official, al-Naji did not follow through with this threat.

Al-Naji concluded his account by stating that none of his family members in Jordan had

encountered any problems with Jordanian officials since he left the country. Moreover, al-Naji's family members also have informed him that the police have not inquired into his whereabouts since 2000, when Mohalmed informed them that he had left the country. And although al-Naji provided his contact information in his letter to King Abdullah II, no Jordanian officials have attempted to reach him in the United States. Nevertheless, al-Naji insisted that he still believed that Jordanian authorities were actively working to arrest him on false charges of embezzlement and defaming the Queen, and that he is "sure" he will be detained "for a period of not less than three months" and tortured if he returns.

The IJ denied all relief except voluntary departure. The IJ determined that al-Naji had failed to show that his untimely asylum petition resulted from extraordinary circumstances, *see* 8 U.S.C. § 1158(a)(2)(D), or that he qualified for CAT relief. When denying al-Naji's request for withholding of removal, the IJ deemed credible his claims about having observed torture during his time as a policeman, and that he uncovered corruption at the Fund. However, the IJ noted that al-Naji never was arrested or detained, and that there was no evidence showing that the authorities sought him in connection with the Fund corruption. Thus, the IJ concluded, al-Naji had failed to establish a clear probability that he would suffer persecution if he returned to Jordan. Al-Naji appealed the decision to the BIA, which agreed with the IJ that al-Naji had not shown a clear probability that he would be persecuted if returned.

## II. ANALYSIS

In his petition for review, al-Naji challenges the immigration courts' denial of his request for withholding of removal by arguing that the courts wrongly concluded that he failed to show a clear probability of future persecution on account of his political opinion.[2] Specifically, al-Naji asserts that the evidence he submitted to the IJ established that it is more likely than not that he will be tortured upon his return to Jordan "because of his 'whistle blowing' against corruption within the Jordanian government." At oral argument, though, al-Naji's attorney moved to voluntarily dismiss al-Naji's petition on the basis that al-Naji had departed for Jordan while the petition was pending; al-Naji's attorney further stated that he had no "direct contact" with al-Naji since al-Naji's departure, and thus could not confirm that al-Naji wished to voluntarily dismiss the petition. We accordingly continued these proceedings to allow al-Naji's attorney the opportunity to contact him regarding the dismissal of his case. *See al-Naji v. Gonzales*, No. 07-1030 (7th Cir. Aug. 22, 2007) (unpublished order). However, al-Naji's attorney has recently informed us that,

---

[2] Al-Naji abandons his asylum and CAT claims by not pursuing them in his brief. *See Mema v. Gonzales*, 474 F.3d 412, 421 (7th Cir. 2007); *Zheng v. Gonzales*, 409 F.3d 804, 809 (7th Cir. 2005).

despite his attempts over the last six months to locate al-Naji in Jordan, he has been unable to do so; thus, counsel concluded, continued attempts to contact al-Naji would prove fruitless.  In other words, al-Naji's attorney still does not know whether al-Naji does, indeed, wish to voluntarily dismiss his petition; neither do we.  We accordingly deny al-Naji's attorney's motion for voluntary dismissal, and proceed to the merits of his argument. *See* Fed. R. App. P. 42(b); *NLRB v. Brooke Indus., Inc.*, 873 F.2d 165, 166 (7th Cir. 1989) (stating that parties must "sign and file with the clerk of this court an agreement that the proceeding be dismissed" to voluntarily dismiss appeal).

In cases such as this, where the BIA's opinion supplements the IJ's decision, the latter decision as supplemented by the BIA's opinion becomes our basis for review.  *See Brucaj v. Ashcroft*, 381 F.3d 602, 606 (7th Cir. 2004).  We review the denial of withholding of removal under the substantial-evidence standard, *see Ahmed v. Ashcroft*, 348 F.3d 611, 615 (7th Cir. 2003), and will uphold the immigration courts' decisions if they are supported by reasonable, substantial, and probative evidence, *see Mabasa v. Gonzales*, 455 F.3d 740, 744 (7th Cir. 2006).  Moreover, we will overturn the immigration courts' decisions only when "the record compels a contrary result." *Brucaj*, 381 F.3d at 606.  In addition to this deferential standard of review, al-Naji faces a high hurdle when seeking withholding of removal.  *See Zheng*, 409 F.3d at 809 (noting that it is more difficult to obtain withholding of removal than it is to obtain asylum).  Specifically, he must show there is a "clear probability"—meaning it is "more likely than not"—that he will be persecuted on account of his political opinion if he returns to Jordan.  *See* 8 U.S.C. § 1231(b)(3)(A); *Boci v. Gonzales*, 473 F.3d 762, 767 (7th Cir. 2007); *Kobugabe v. Gonzales*, 440 F.3d 900, 901 (7th Cir. 2006) ("For withholding, although persecution in the past may imply a future threat and so require the agency to demonstrate that conditions have improved, the focus remains on what is likely to happen following an alien's return home."  (internal citations omitted)).

The IJ and BIA correctly determined that it was not likely that al-Naji would be persecuted if he returned to Jordan.  Al-Naji's entire claim of future persecution is based on the assumption that Jordanian authorities seek to detain him, either for defaming the Queen or embezzling from the Fund; this, he claims, is shown by the three summonses he received ordering him to appear in court.  However, there is no evidence that the summonses were related to the Fund corruption.  In fact, al-Naji admitted that he thought the 1997 summons was related to his ceramics factory, and stated he had no evidence showing that the third summons delivered to his brother Mohalmed was related to the Fund.  And although the 1999 summons states that the Jordanian "State's Attorney" initiated against al-Naji a "suit of the public right," there's nothing to suggest that the "suit" was related to the Fund; that "suit" also could have been related to al-Naji's ceramics factory.

Additionally, al-Naji's testimony contradicts his claim that Jordanian police sought to detain and torture him; in fact, his testimony suggests that, during the three years following

his termination from the Fund, he was not concerned about government persecution at all. Specifically, during this time he (1) unsuccessfully sought other government jobs; (2) purposefully ignored a summons to appear in court; and (3) successfully applied for government licenses to establish and openly operate a ceramics factory. Moreover, al-Naji admitted that he had applied for a visa from Brunei not so he could escape possible persecution, but so he could "find a permanent job." In addition, he did not leave Jordan as soon as he obtained the visa, as a person fleeing persecution would be expected to do. Instead, he remained in Jordan for two weeks until he received the second summons, and even then he did not leave the country until he received an American visa and job offer, thus suggesting that he was not escaping persecution, but rather seeking economic opportunity.

Even more, al-Naji's testimony directly calls into question the legitimacy of his fear of future persecution. He stated that Jordanian authorities have not attempted to locate him in Jordan since 2000, when Mohalmed informed police that he had left the country; nor have the authorities attempted to contact him in the United States, even though he himself volunteered his contact information to King Abdullah II. These admissions, when combined with the dearth of evidence supporting al-Naji's claim, do not compel a conclusion that the immigration courts erroneously concluded that he failed to show it is more likely than not that he will be persecuted upon returning to Jordan. *See Boci*, 473 F.3d at 767; *Brucaj*, 381 F.3d at 606.

### III. CONCLUSION

We DENY al-Naji's petition for review.